*This opinion is subject to revision before publication*

# UNITED STATES COURT OF APPEALS
## FOR THE ARMED FORCES

————————

### UNITED STATES
Appellee

**v.**

### Austin L. HENDRIX, Specialist
United States Army, Appellant

### No. 16-0731
Crim. App. No. 20140476

Argued March 16, 2017—Decided June 1, 2017

Military Judge: David H. Robertson

For Appellant: *Captain Cody Cheek* (argued); *Colonel Mary J. Bradley, Lieutenant Colonel Christopher D. Carrier, Major Christopher D. Coleman,* and *Captain Matthew L. Jaladoni* (on brief).

For Appellee: *Captain Linda Chavez* (argued); *Colonel Mark H. Sydenham, Lieutenant Colonel A. G. Courie III,* and *Major Cormac Smith* (on brief).

Judge OHLSON delivered the opinion of the Court, in which Chief Judge ERDMANN, and Judges STUCKY, RYAN, and SPARKS, joined.

————————

Judge OHLSON delivered the opinion of the Court.

Contrary to Appellant's pleas, a general court-martial with enlisted representation convicted Appellant of one specification of sexual abuse of a child, in violation of Article 120b, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920b (2012). Appellant's adjudged and approved sentence consisted of confinement for thirty months, a reduction to E-1, forfeiture of all pay and allowances, and a dishonorable discharge. The United States Army Court of Criminal Appeals (CCA) affirmed the approved findings and sentence. *See United States v. Hendrix*, 75 M.J. 704, 707 (A. Ct. Crim. App. 2016). We granted review on five issues, but we need only address the following two issues:[1]

---

[1] We also granted review as to whether a judge could simultaneously sit on the CCA and the United States Court of Military

[I]. Whether the military judge abused his discretion in denying Appellant's motion to compel an expert consultant, EP, in the field of audio forensic science and voice identification.

[II]. Whether the military judge abused his discretion when he denied a defense motion to suppress related to the identification of the Appellant during a voice lineup.

*United States v. Hendrix*, 76 M.J. 40, 40–41 (C.A.A.F. 2016).

For the first issue, we conclude that the military judge did not abuse his discretion because the defense failed to demonstrate the necessity of having an expert consultant in the field of audio forensic science and voice identification assist him before trial. For the second issue, we conclude that the military judge did abuse his discretion because under the factual circumstances of the instant case, the putative voice-lineup evidence had no probative value. We further conclude that this evidence substantially influenced the members' findings and thus had a prejudicial effect. Accordingly, we reverse the decision of the United States Army Court of Criminal Appeals.

## I. Background

On June 10, 2013, Appellant and Private First Class (PFC) BW visited the quarters of Specialist (SPC) PK in Kaiserslautern, Germany. SPC PK shared this home with his wife, his ten-year-old daughter (Miss JK), his nine-year-old daughter, and two infant daughters. Appellant had visited SPC PK's home on a few occasions, and PFC BW was a frequent visitor to the home. During the evening of June 10, Appellant interacted with Miss JK by braiding her hair, and Appellant and SPC BW slept overnight at the house.

The following day after school, Miss JK asked her stepmother whether she had ever been "sexually assaulted." The stepmother stated that she had and inquired why Miss JK

---

Commissions Review (USCMCR). In *United States v. Ortiz*, we held that the appellate military judge was statutorily authorized to sit on the CCA and his presidential appointment to sit on the USCMCR did not violate the Appointments Clause with regard to his status on the CCA. 76 M.J. 189 (C.A.A.F. 2017). Therefore, we resolve this matter in favor of the Government.

was asking. This prompted Miss JK to tell a story about a friend's mother being sexually assaulted the prior night.

Later that afternoon, SPC PK and his wife smelled cigar smoke in the house and asked their two older daughters who was responsible. Miss JK and her sister both denied responsibility and began blaming the other. When neither daughter admitted responsibility, SPC PK "gave them a few spankings with [his] work belt." He took a five-minute break from the first set of spankings. When neither girl would admit responsibility, he spanked them again until he took another break. These spankings resulted in abrasions and bruises on Miss JK's right thigh and hip area and a bruise on her inner left thigh. During the second or third break from the spankings, SPC PK's wife overheard Miss JK tell her sister to take the blame for lighting the cigar because Miss JK had been sexually assaulted the night before and did not want her father to keep hitting her. When SPC PK's wife sought clarification, Miss JK was "very hesitant to say much" and "was very shy about it." At that time, Miss JK did not identify Appellant as the perpetrator of the sexual assault. Instead, Miss JK stated that "she didn't know who, but she knew it wasn't [PFC BW] because she knew his voice."

After making this allegation of abuse, Miss JK saw a sexual assault nurse examiner (SANE) at the emergency room. Miss JK reported to the SANE multiple times that the touching of "her private parts" occurred "on top of her pants."

The Army Criminal Investigation Command (CID) conducted an investigation into Miss JK's allegations. CID collected the clothing that Miss JK was wearing on the night of the alleged assault, including her underwear. A DNA examination of the underwear revealed that "there was male DNA there," but it was only an "inconclusive DNA profile." The forensic examiner could not "pinpoint" where the DNA was found on the underwear, but the profile came from "a swab of the waistband, inside front panel, as well as inside crotch" of the underwear. The examiner also could not match the DNA to Appellant or to any other individual because it was of "low quality and minute [quantity]."

CID also spoke with Miss JK about her allegations. Miss JK reported that: (1) she was "really tired" and did not remember much about the incident; (2) she "felt like" it was "a dream or something;" (3) she was "pretty sure" the incident was not a dream; and (4) the perpetrator did not pull down her clothes. Pursuant to questioning by CID, Miss JK eventually identified Appellant as the perpetrator through the process of elimination by stating that PFC BW "didn't do it," her father "wouldn't do it," her sister and mother would not do it, and Appellant "was the only other one" in their house the night of the incident. Miss JK also informed CID that she heard Appellant's voice, but she did not see Appellant's face because "it was really dark."

Following law enforcement's investigation, the Government preferred a charge of sexual abuse of a child against Appellant. However, the Article 32, UCMJ, 10 U.S.C. § 832 (2012), investigating officer determined that Miss JK "did not provide credible testimony regarding the sexual assault." The investigating officer further found that no "reasonable ground exist[ed] to believe that" Appellant had committed the offense because there was "no credible evidence to believe that [Appellant] touched [Miss JK's] groin area," and even if the incident did occur, he was "still not convinced that [Appellant] is the person that sexually assaulted her." The investigating officer noted that Miss JK had only met Appellant on two other occasions and that "CID never did a voice [lineup] to confirm whether [Miss JK] could identify [Appellant's] voice." After the Article 32, UCMJ, investigation was completed, government counsel requested that CID conduct a voice lineup.

A CID agent in Kaiserslautern, Germany, created voice recordings to conduct the voice lineup. The agent had never performed or created a voice-identification procedure before. Furthermore, the CID office in Germany did not have any protocols or standard operating procedures for voice identifications. However, the CID agent believed the procedures for creating voice lineups were the same as photographic arrays.

The CID agent recorded the voices of six individuals: Appellant; PFC BW; three CID agents; and a Navy sailor. At the suppression hearing, defense counsel told the military

judge that one of the CID agents had a speech impediment and that the Navy sailor "was picked simply at random" and had a cough, "sinus issues," and a Jamaican accent. (Appellant is Caucasian.) The trial counsel did not dispute this characterization. Although Miss JK only heard the perpetrator speak in a whisper, the CID agent asked each male to say two sentences—"Is your sister asleep" and "Promise me you won't tell anybody"[2]—at three ascending volume levels: "a whisper, above a whisper, and [a] normal voice." The CID agent then created three voice-identification segments. Each segment included all six voices being played at each voice level. The only difference between the segments was the position of the voices—each voice was played in a different order for the three segments. The CID agent sent the voice-identification segments to the CID office at Fort Eustis, Virginia, where SPC PK was then stationed with his family.

On March 7, 2014,—nine months after the alleged sexual assault occurred—a CID agent conducted the voice lineup with Miss JK at the Fort Eustis CID office. This CID agent had never performed a voice lineup, but he, like his counterpart in Germany, equated it with a photographic identification.

To facilitate the voice lineup, the command directed SPC PK to bring Miss JK to the CID office without explaining the purpose of the visit. The CID agent then obtained SPC PK's consent to perform the voice identification with Miss JK and directed SPC PK not to interact with Miss JK during the voice-identification procedure. The CID agent explained the procedure to Miss JK and asked her "to listen very intently and [to state whether she] actually … recognized any of the voices as the alleged offender" after each segment. After playing the first segment, Miss JK stated that she recognized two out of the six voices as the "pictures she had in her head of the voices that had touched her wrong." Miss JK was "confident" that one of the two voices was that of the perpetrator. For the second and third segments, Miss JK did not "second-guess[] herself" in selecting Appellant's voice.

---

[2] Miss JK reported that the alleged perpetrator had whispered these two sentences.

Following this voice identification, the convening authority referred one charge of sexual abuse of a child to a general court-martial. Before trial, Appellant sought to suppress Miss JK's voice identification and to compel the production of an expert consultant in the field of audio forensic science and voice identification.

The military judge conducted an Article 39(a), UCMJ, 10 U.S.C. § 839(a) (2012), hearing on both motions. Appellant's proposed expert, Mr. EP, testified as an expert in voice identification at the hearing. He generally noted that whisper identifications are less reliable than full voice identifications. In regard to Appellant's case, Mr. EP expressed "several concerns" with CID's voice lineup and concluded that it was "not reliable and … should not be used to prosecute or convict somebody of a crime." Following the Article 39(a), UCMJ, hearing, the military judge summarily denied the motion to suppress and the motion for an expert consultant.[3]

At trial, the Government did not admit the voice lineup itself or the accompanying audio into evidence, but the court-martial received considerable evidence describing both the lineup and its results. The Government introduced evidence about the voice identification through three witnesses. First, trial counsel elicited from Miss JK that she had identified Appellant's voice during the lineup. Miss JK testified that she knew it was Appellant because "he was the only person in my house who had the girlish voice." Miss JK testified that PFC BW, in contrast, had "a scratchy type of voice." Second, SPC PK testified that he witnessed the voice lineup and no one told Miss JK whose voice to identify. Third, the CID agent who conducted the voice lineup testified that: (1) Miss JK identified two voices in the first voice segment and indicated that "these are the faces [she] imag-

---

[3] Four months after trial, the military judge indicated that he did not have to enter findings of fact or conclusions of law with respect to each motion because the Government did not admit the voice lineup or the audio of the voice lineup into evidence. We agree with the Army Court of Criminal Appeals that the military judge erred in "tacit[ly] conclu[ding] that the voice-identification dispute was moot" because "the government did present ample testimony regarding the procedure and its results." *United States v. Hendrix*, 75 M.J. 704, 706 (A. Ct. Crim. App. 2016).

ine[d] as being the ones that touched [her] wrong"; and (2) for the second and third voice segments she chose the same voice, identifying it as that of the person who "touched [her] wrong." The CID agent further indicated that Miss JK was confident in her identification.

In addition to the voice-identification evidence, both Miss JK and Appellant testified about the night of the alleged incident. Miss JK testified that on June 10, 2013, she went to sleep around 8:30 p.m. She, at the age of ten, was taking sleeping medicine at this time because of sleeping problems. Miss JK testified that Appellant entered the bedroom and asked, "Is your sister asleep?" Contrary to her earlier statements, Miss JK testified that she could see Appellant because the kitchen light was on and her blinds were open, and described him as having short, blond hair and being as tall as her father. Miss JK testified that Appellant sat on the side of her bed and told her that she could trust him. Then, contrary to her earlier statements that she was inappropriately touched over her clothing, Miss JK testified that Appellant "pulled down [her] pants and underwear," placed his hand on the inside of her underwear, "touched [her] private area," and moved "his hand up and down" for approximately five to ten minutes. After Appellant stopped, he told Miss JK "not to tell anyone," pulled her pants up, and left the room. Appellant testified that he never entered Miss JK's bedroom on the night of the incident. Nevertheless, the members convicted Appellant of one specification of sexual abuse of a child.

We will begin by examining whether the military judge erred in denying an expert consultant before addressing whether he erred in admitting the voice-identification evidence.

## II. Discussion

We review a military judge's decision denying a request for an expert consultant for an abuse of discretion. *United States v. Lloyd*, 69 M.J. 95, 99 (C.A.A.F. 2010). We also review a military judge's admission of evidence for an abuse of discretion. *United States v. Hills*, 75 M.J. 350, 354 (C.A.A.F. 2016). This abuse of discretion standard is "a strict one, calling for more than a mere difference of opinion"—"[t]he chal-

lenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous." *Lloyd*, 69 M.J. at 99 (citation omitted) (internal quotation marks omitted). In this case, the military judge provided no explanation for his decisions to deny the expert consultant and to admit the evidence of the voice identification. Therefore, the military judge's decisions are entitled to "less deference." *United States v. Flesher*, 73 M.J. 303, 312 (C.A.A.F. 2014).

## A. Expert Consultant

We conclude that the military judge did not abuse his discretion in denying Appellant's request to have Mr. EP serve as an expert consultant in the field of audio forensic science and voice identification. In reaching this conclusion, we note that regardless of his argument on appeal, Appellant never requested that Mr. EP serve as an expert *witness* at trial. Instead, he only sought Mr. EP as an expert *consultant*.

"An accused is entitled to an expert's assistance before trial to aid in the preparation of his defense upon a demonstration of necessity." *United States v. Bresnahan*, 62 M.J. 137, 143 (C.A.A.F. 2005). To establish necessity, "an accused must demonstrate something more than a mere possibility of assistance from a requested expert." *United States v. Gunkle*, 55 M.J. 26, 31 (C.A.A.F. 2001) (citation omitted) (internal quotation marks omitted). Instead, the accused must establish a reasonable probability "that (1) an expert would be of assistance to the defense and (2) that denial of expert assistance would result in a fundamentally unfair trial." *United States v. Anderson*, 68 M.J. 378, 383 (C.A.A.F. 2010) (citation omitted). To establish that an expert would be of assistance, "the accused must show (1) why the expert assistance is needed; (2) what the expert assistance would accomplish for the accused; and (3) why the defense counsel were unable to gather and present the evidence that the expert assistance would be able to develop." *Id.* (citation omitted) (internal quotation marks omitted).

Simply stated, in the instant case, the record reflects that Appellant failed to meet this burden of demonstrating necessity. As part of our analysis, we note that Appellant did receive some assistance from the requested expert when Mr.

EP testified at the Article 39(a), UCMJ, hearing about deficiencies in the Government's voice-identification procedure. In light of this help, Appellant has not shown why additional expert consultation was needed. Further, the defense had other scholarly resources available to assist it in defending against the voice-identification evidence.[4] *See United States v. Kelly*, 39 M.J. 235, 238 (C.M.A. 1994) ("Defense counsel are expected to educate themselves to attain competence in defending an issue presented in a particular case," including consulting "a number of primary and secondary materials."). Appellant has not shown why these scholarly works, or works like them, were inadequate to prepare his defense. Because Appellant failed to make a showing of necessity, we conclude that the military judge did not abuse his discretion in denying the motion for an expert consultant in the field of audio forensic science and voice identification.

## B. Voice Identification

We next examine whether the military judge abused his discretion when he admitted into evidence—over defense objection—the results of the voice lineup where Miss JK purportedly identified Appellant as her assailant. We conclude that the voice-identification evidence had no probative value and that its admission was prejudicial.

Turning first to the question of probative value, we note that only relevant evidence is admissible at courts-martial. *See* Military Rule of Evidence (M.R.E.) 402(a). Evidence that has no probative value is not relevant and is therefore inadmissible at trial. *See* M.R.E. 402(b) ("Irrelevant evidence is not admissible."); *see also United States v. Clark*, 535 F.3d 571, 579–80 (7th Cir. 2008) (holding that evidence with "no probative force … was properly excluded").

In certain instances, a voice identification may have "considerable probative value." *See United States v. Brown*, 510 F.3d 57, 69 (1st Cir. 2007). However, the voice-lineup evidence in Appellant's case had no probative value as to

---

[4] *See, e.g.*, Jason A. Cantone, *"Do You Hear What I Hear?": Empirical Research on Earwitness Testimony*, 17 Tex. Wesleyan L. Rev. 123, 126 (2011); Lawrence M. Solan & Peter M. Tiersma, *Hearing Voices: Speaker Identification in Court*, 54 Hastings L.J. 373, 380 (2003).

whether the sexual assault actually occurred, or if the sexual assault did occur, whether Appellant was the person who perpetrated that assault.

We preliminarily note that it is difficult to discern a legitimate investigative purpose for conducting a voice lineup in this case after the victim had already identified Appellant—whom she knew from social interactions at her home on two separate occasions, to include the close personal interaction of having Appellant braid her hair—as the person who had sexually abused her. Certainly it would be highly unusual—at a minimum—for law enforcement to conduct a more traditional visual lineup in a case where a victim already had identified the perpetrator, the victim was familiar with the perpetrator from prior social occasions, and the perpetrator already had been charged with the offense. But even assuming that the voice lineup in this case was not intended to merely bolster the testimony of Miss JK by dressing up her identification in scientific garb, the lineup was not conducted in a manner that would assist the trier of fact in deciding whether or not Appellant perpetrated the reported sexual assault. We reach this conclusion for several reasons.

First, there were flaws in the selection of participants in the voice lineup. Mr. EP, the voice-identification expert, presented unrebutted testimony that voice identifications should "[a]bsolutely" use individuals with similar voices. And yet, that did not happen here. The CID agent who assembled the voice lineup was a novice with voice identifications. He selected six individuals without conducting any screening of voices. This resulted in the selection of one individual with a speech impediment and another with a Jamaican accent. It also led to the CID agent using Appellant's "girlish voice" in the same voice segment as PFC BW's "scratchy" voice. Indeed, Miss JK recognized the differences in the voices because she testified that some of the voices sounded strange and that none of them sounded the same.[5]

---

[5] We note that the CCA found the "tone, cadence, and volume of each voice to be remarkably similar to one another." *Hendrix*, 75 M.J. at 706. However, this finding is unhelpful because it does not establish that the voices themselves were similar. This is best

Second, CID had the individuals who provided the voice exemplars speak two sentences at a whisper and then, in the same sound bite, repeat those same sentences at two increasingly louder volumes. The record does not reflect any legitimate investigatory purpose for this methodology. Further, we note that (a) Miss JK only heard the alleged perpetrator speak in a whisper so it was unnecessary for her to hear the louder exemplars, and (b) Miss JK already was familiar with Appellant's spoken—rather than whispered—voice and already had identified him as the perpetrator, so the three back-to-back repetitions of the two sentences merely served to taint any purported identification Miss JK could otherwise have made of the whispered voice she heard on the night in question.

Third and finally, during the motions hearing, the voice expert raised a number of legitimate concerns about the voice lineup employed in Appellant's case. For example, the CID agents, who did not have experience with voice lineups, did not remove Appellant's voice from the segments that also included PFC BW's voice. Additionally, the voice expert observed that Miss JK's identification was based on memory—the voice lineup in Virginia occurred nine months after the alleged sexual abuse occurred in Germany—and indicated that "[m]emory is not something that serves us well with … being able to identify somebody through their voice." In fact, the voice expert's concerns led to his unrebutted opinion that the voice lineup in Appellant's case was "not reliable."

Because these circumstances demonstrate that the voice-lineup evidence had no probative value in this case, we conclude that the military judge abused his discretion in admitting it into evidence.[6] Accordingly, we next turn our atten-

---

exemplified by the fact that the tone, volume, and cadence of a female speaker can also be remarkably similar to the tone, volume, and cadence of a male speaker.

[6] Even if the voice-identification evidence had some minimal probative value, it was inadmissible under M.R.E. 403 because this minimal probative value was substantially outweighed by the misimpression it left on the members about the usefulness and importance of the voice identification. *See* M.R.E. 403 (providing that relevant evidence may be excluded where "its probative value is substantially outweighed by a danger of unfair prejudice … [or]

tion to the issue of prejudice. *See* Article 59(a), UCMJ, 10 U.S.C. § 859(a) (2012).

The erroneous admission of evidence is prejudicial when it has a substantial influence on the members' findings. *United States v. Norman*, 74 M.J. 144, 150 (C.A.A.F. 2015). "We evaluate prejudice from an erroneous evidentiary ruling by weighing (1) the strength of the Government's case, (2) the strength of the defense case, (3) the materiality of the evidence in question, and (4) the quality of the evidence in question." *United States v. Kerr*, 51 M.J. 401, 405 (C.A.A.F. 1999). After weighing these factors, we conclude that the admission of the voice identification substantially influenced the members' findings.

In regard to the strength of the Government's case, we conclude that it was weak both in regard to whether the incident actually occurred, and if it did occur, whether Appellant was the perpetrator. Turning initially to the question of whether the sexual abuse actually happened, we begin by noting that Miss JK was taking sleep medication when the incident occurred. When discussing the incident with CID, Miss JK stated that the incident "felt like" it was "a dream or something" and that she was only "pretty sure" it was not a dream.

Next, Miss JK used the term "sexual assault" to describe what happened, and the defense expert in clinical psychology, child development, and the treatment of child sexual abuse victims described this usage as being "extremely irregular for a child" because children do not typically know what the term "sexual assault" means. During cross-examination, Miss JK disclosed that she learned about this term prior to the alleged incident from a public service announcement on the Armed Forces Network. The defense expert further testified that it was "odd" that Miss JK altered "core pieces of" her sexual abuse story because victims ordinarily do not change such details.

---

misleading the members"); *cf. Perry v. New Hampshire*, 565 U.S. 228, 247 (2012) (noting that "trial judges [may] exclude relevant evidence if its probative value is substantially outweighed by its prejudicial impact or potential for misleading the jury").

And we finally observe that Miss JK did not divulge her allegations of sexual abuse until she was seeking a means to put a stop to the painful physical punishment being inflicted upon her by her father. When evaluating these aspects of the trial evidence, we conclude that the Government's case was weak with respect to whether the sexual assault even occurred.

Turning next to the identity of the perpetrator, we also conclude that the Government's case was weak. The most important piece of evidence as to the identity of the perpetrator was the erroneously admitted evidence of Miss JK's voice identification. Absent the voice identification, the remaining evidence demonstrated that Miss JK's statements about her ability to see and identify the perpetrator on the night of the incident varied greatly. Specifically, Miss JK initially reported that she could not see the perpetrator because the room was "really dark." But as time passed, Miss JK testified that she could see Appellant at the time of the sexual assault because the kitchen light was on and her blinds were open. Finally, we note that there was no other substantial evidence tying Appellant to this reported offense. For example, the male DNA evidence introduced by the Government at trial was minimal and inconsequential. We therefore conclude that the Government's case was weak on two important facets of the case: whether the incident occurred and whether Appellant was the perpetrator.

Moreover, it is clear from the record that the voice-identification evidence was vital to the Government's case. The Supreme Court has recognized that "identification testimony is significant evidence," *Manson v. Brathwaite*, 432 U.S. 98, 113 n.14 (1977) (citation omitted) (internal quotation marks omitted) and, indeed, in the instant case trial counsel treated Miss JK's identification evidence as a significant component of the Government's case. For example, at a pretrial hearing, trial counsel described the voice-identification evidence as "important evidence." Further, during opening statement, trial counsel underscored to the panel members the importance of the identification evidence by referring to Miss JK's voice identification as the "last important detail." Trial counsel then elicited evidence of the voice identification through three witnesses. Trial counsel

finally emphasized the importance of the voice identification in findings argument by (1) pointing "[m]ost importantly" to Miss JK's recognition of Appellant's voice in explaining why Appellant was the perpetrator, and (2) defending the voice identification in rebuttal argument. Trial counsel's position with respect to the voice identification demonstrates that it was important evidence to the Government's case.

The materiality of the voice-lineup evidence is further exemplified by the disparate conclusions reached by the investigating officer and the court-martial panel. At the Article 32, UCMJ, hearing, the investigating officer declined to recommend forwarding the charges under a reasonable grounds standard. *See* Rule for Courts-Martial 405(j)(2)(H). However, at trial, the panel voted to convict despite the higher standard of proof—beyond a reasonable doubt. *See* Article 51(c)(4), UCMJ, 10 U.S.C. § 851(c)(4) (2012). The record indicates that the only significant difference between the evidence presented at the Article 32, UCMJ, hearing and the trial was Miss JK's voice identification.[7]

Based on these circumstances, we decline the appellate government counsel's invitation to view the voice-identification evidence as being entirely inconsequential. Instead, we conclude that the erroneous admission of this evidence substantially influenced the members' findings—and was therefore prejudicial—because of the Government's weak case and the importance of the voice-identification evidence.

---

[7] We further observe that Miss JK's voice identification was presented as a definitive identification. Miss JK testified that she "knew" the voice was Appellant's because "he was the only person in [her] house who had the girlish voice." Also, the CID agent who conducted the voice lineup described Miss JK as being "absolutely sure" about her identification. The certainty of the voice identification would have been persuasive to the members. *See Young v. Conway*, 698 F.3d 69, 88 (2d Cir. 2012) (indicating that "jurors may also erroneously have relied on certainty [of identification testimony] as an indicator of accuracy"); *United States v. Schiro*, 679 F.3d 521, 543 (7th Cir. 2012) (Wood, J., dissenting) ("We cannot ignore the power that a witness's claim to be '100% sure' may have on a jury …."); *cf. Brathwaite*, 432 U.S. at 115–16 (identifying the level of certainty of an identification as an indicator of an accurate identification).

### III. Decision

For the reasons discussed above, the military judge abused his discretion in admitting the voice-lineup evidence over the objection of defense counsel when it had no probative value and only served to bolster the complainant's testimony in an otherwise weak case. Therefore, the decision of the United States Army Court of Criminal Appeals is reversed. The findings and sentence are set aside. The record is returned to the Judge Advocate General of the Army and a rehearing is authorized.