*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps
# Court of Criminal Appeals

Before
HOLIFIELD, GROSS, and BLOSSER
Appellate Military Judges

_____

**UNITED STATES**
*Appellee*

**v.**

**Dominic L. RUIZ**
Corporal (E-4), U.S. Marine Corps
*Appellant*

**No. 202300007**

_____

Decided: 20 March 2024

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judges:
Adam M. King (arraignment/motions)
Cory M. Picton (motions)
Melanie J. Mann (trial)
Benjamin C. Robertson (entry of judgment)

Sentence adjudged 29 July 2022 by a general court-martial convened at Marine Corps Base Hawaii, consisting of officer and enlisted members on the merits and military judge alone for sentencing. Sentence in the Entry of Judgment: reduction to E-1 and a bad-conduct discharge.

For Appellant:
*Major Colin W. Hotard, USMC*

For Appellee:
*Lieutenant Commander James P. Wu Zhu, JAGC, USN*
*Lieutenant Michael A. Tuosto, JAGC, USN*

Judge GROSS delivered the opinion of the Court, in which Chief Judge HOLIFIELD and Judge BLOSSER joined.

_____

**This opinion does not serve as binding precedent, but may be cited as persuasive authority under NMCCA Rule of Appellate Procedure 30.2.**

_____

GROSS, Judge:

A panel of officer and enlisted members convicted Appellant, contrary to his pleas, of one specification of abusive sexual contact in violation of Article 120, Uniform Code of Military Justice [UCMJ].[1]

Appellant asserts six assignments of error which we summarize as follows: (1) whether the evidence is factually sufficient to support Appellant's conviction; (2) whether the military judge abused her discretion in admitting a prior consistent statement of the victim; (3) whether the military judge abused her discretion in denying a defense-requested evidentiary instruction; (4) whether the military judge abused her discretion in excluding certain testimony of an expert witness; (5) whether cumulative error denied Appellant a fair trial; and (6) whether Appellant was entitled to a unanimous verdict.[2] Having considered the record as a whole, we have determined that the findings and sentence are correct in law and fact, and that no error materially prejudicial to Appellant's substantial rights occurred.[3]

---

[1] 10 U.S.C. § 920.

[2] In accordance with *United States v. Anderson*, 83 M.J. 291 (C.A.A.F. 2023) *cert. denied*, ___ U.S. ___, 2024 U.S. LEXIS 827 (2024), we hold Appellant was not entitled to a unanimous verdict at his court-martial.

[3] Articles 59 & 66, Uniform Code of Military Justice, 10 U.S.C. §§ 859, 866.

## I. BACKGROUND

Appellant was stationed in Okinawa, Japan and in May 2020 was assigned temporary orders to Camp Lejeune, North Carolina. After arriving in North Carolina, Appellant decided to reach out to people he knew in the Camp Lejeune area to see if anyone wanted to get together. Among the individuals Appellant contacted were Ms. Sierra, who was then on active duty as a lance corporal [LCpl],[4] and her husband LCpl Connor—both of whom Appellant met when they were "poolees"[5] in 2017. Unbeknownst to Appellant at the time, LCpl Connor was confined at the Camp Lejeune brig. Ms. Sierra responded to Appellant's effort to reach out via text message, and agreed to meet up with him for dinner.

After accepting Appellant's invitation to meet up, Ms. Sierra texted her friend, Ms. Monroe, the following exchange:

> Ms. Sierra:      guess who I'm hanging out with later!!
>
> Ms. Monroe:   WHO!
>
> Ms. Sierra:      Dom [Appellant], like the dom that brought us al-cohol to that party at my house
>
> Ms. Monroe:   OH he was cute!
>
> Ms. Sierra:      He's in town for business and was like wanna hang out and I was like lord please
>
> Ms. Monroe:   Ayeeeee
>
> Ms. Sierra:      I was tempted to text cardoso to ask if he wanted to hang out too lol
>
> Ms. Monroe:   Do it![6]

Appellant and Ms. Sierra then went to a local restaurant to eat; however, due to restrictions from the COVID 19 pandemic, they could only order take-

---

[4] All names in this opinion, other than those of Appellant, the judges, and counsel, are pseudonyms. Although she was on active duty at the time of the alleged offense, Ms. Sierra had separated from the Marine Corps by the time of trial and will be referred to throughout this opinion as Ms. Sierra as she was at trial.

[5] "Poolees" is a colloquial term used to refer to individuals in the Marine Corps Delayed Entry Program. The Marine Corps Delayed Entry Program requires prospective Marines to sign a contract entering them into the inactive reserves. Once certain criteria are met, individuals enrolled in the program will activate and attend boot camps.

[6] Pros. Ex. 7 at 2.

out. Appellant subsequently asked Ms. Sierra whether she wanted to go back to his hotel to eat or whether she preferred to eat at her house. Ms. Sierra told Appellant she preferred to go to her house.

On the way to Ms. Sierra's house, they stopped at a local grocery store and purchased two bottles of red wine. Appellant and Ms. Sierra then went to her house, where they ate dinner and drank the wine. Ms. Sierra testified that while both she and Appellant were drinking the wine, "[w]henever [her] glass would get half empty, [Appellant] would refill it all the way to the rim."[7] Once they had finished the wine, the two went into Ms. Sierra's backyard where Appellant taught Ms. Sierra how to "shotgun"[8] a beer. Utilizing the "shotgun" method, they each then had about two cans of beer and two cans of Twisted Tea.[9]

Ms. Sierra became very intoxicated and again texted Ms. Monroe, saying "getting my cats high [right now]" and "I'm so drunk bruh."[10] Ms. Sierra testified that she sent the first text in reference to giving her cats catnip, but that she did not remember sending the second message.[11] Ms. Monroe testified that she assumed that Ms. Sierra meant she was smoking marijuana around her cats, but admitted that she had never known Ms. Sierra to use drugs of any kind.

After drinking the wine, beer, and Twisted Tea, Ms. Sierra "could not stand straight and [she] couldn't get [her] thoughts together."[12] She testified that Appellant helped her back into her house and sat her down at the kitchen table.[13] She recalled Appellant placing his hands on her shoulders, but after that her memory was spotty.[14] Ms. Sierra's lack of memory played prominently in both trial counsel's direct examination and defense counsel's cross-examination.

---

[7] R. at 559.

[8] Ms. Sierra defined the term "shotgunning" as puncturing the side of a can of beer, opening the tab, and then drinking out of the puncture hole on the side of the can. R. at 560.

[9] "Twisted Tea" is a form of spiked iced tea containing approximately five percent alcohol; Pros. Ex. 2 at 3.

[10] Pros. Ex. 7 at 1.

[11] R. at 552.

[12] R. at 561.

[13] *Id.*

[14] R. at 562.

Her next memory was of being in Appellant's lap on her couch, being uncomfortable, and trying to get off Appellant's lap.[15] Despite these efforts, Appellant kept pulling her back on top of him.[16] Ms. Sierra testified that Appellant would "shush" her when she tried to get off him, and that she did not want to be on his lap on the couch.[17] Ms. Sierra had no memory of Appellant trying to kiss her at that time.[18]

After being on the couch, Ms. Sierra next remembered being in her bed with Appellant hovering over her before he went into her bathroom.[19] She testified that she did not feel like she could move to get out of her bed, and that she recalled him running his hand up and down her side from her ribs to her buttocks.[20] Her next memory after that was of Appellant telling her how much he wanted her, as he was rubbing her from her vaginal area to her buttocks. During her testimony, Ms. Sierra testified that she told Appellant "no, stop," and pushed his face away from her, but that he continued to grind against her buttocks while she was crying.[21]

Ms. Sierra felt that she could not move, and recalled crying for her husband before blacking out again. She next remembered waking up in the middle of the night in bed next to Appellant, and being unable to find her phone. She then "crawled out of [her] room to the hallway," and made her way down the stairs to the front door.[22] After exiting the house, Ms. Sierra managed to make her way to her neighbor's, the Foxtrots, residence "[t]o get help."[23] Ms. Sierra recalled sitting in front of the Foxtrot's house before ringing their doorbell. When no one answered, she "started pounding on [the Foxtrot's] door and yelling out for help and crying."[24] Ms. Sierra testified Mr. and Mrs. Foxtrot eventually woke up, "opened the door and brought [Ms. Sierra] inside."[25] Ms. Sierra

---

[15] R. at 562-63.

[16] *Id.*

[17] *Id.*

[18] R. at 563.

[19] R. at 565.

[20] R. at 566

[21] R. at 567.

[22] R. at 568.

[23] *Id.*

[24] R. at 568.

[25] R. at 569.

remembered Mrs. Foxtrot giving her a shirt because she was naked.[26] Ms. Sierra then blacked out again before waking up in an ambulance on the way to the hospital.

On cross-examination, trial defense counsel inquired repeatedly into Ms. Sierra's memory of the night in question, pointing out that she did not remember things she previously claimed had happened. Trial defense counsel additionally noted that Ms. Sierra recalled facts in her testimony that she had not previously reported to law enforcement, prosecutors, or other witnesses. In one such exchange, trial defense counsel asked, "[d]o you remember anything that you told [Onslow County Sheriff's Office] Deputy Frank?" to which Ms. Sierra responded, "Not as of right now, sir. I don't really remember."[27] Ms. Sierra answered many of civilian trial defense counsel's questions about things that may have happened or statements that she made with some variant of "it's possible, sir," including whether it was possible that she led Appellant up the stairs to her bedroom prior to the assault.[28]

Trial counsel later sought to call Deputy Frank to testify that Ms. Sierra told him that she told Appellant "[n]o" and that Ms. Sierra told Deputy Frank she did not remember how she got up the stairs.[29] The military judge initially sustained the Defense objection to Deputy Frank's testimony, but subsequently reconsidered her ruling and permitted Deputy Frank to testify about those two statements made by Ms. Sierra. The basis for this ruling was to rehabilitate Ms. Sierra's credibility due to the attack on her memory on cross-examination.[30]

Mr. and Mrs. Foxtrot testified at trial to being woken up by Ms. Sierra banging on their front door and screaming for help.[31] Mrs. Foxtrot described Ms. Sierra as being naked and "screaming profusely" while sitting on the Foxtrot's staircase with her legs spread open, "touching herself."[32] When asked to describe how Ms. Sierra was touching herself, Mrs. Foxtrot clarified Ms. Sierra was not touching herself in a sexual manner, and instead described the touching as "like gnats or mosquitoes were touching, like biting or something, it was

---

[26] *Id.*

[27] R. at 581.

[28] R. at 577-612.

[29] R. at 781.

[30] R. at 833-836

[31] R. at 648-49.

[32] R. at 650.

just, like, a constant, like—[Ms. Sierra] just was moving—like, moving her legs open. Just couldn't sit still."[33] Mrs. Foxtrot testified to "thinking maybe [Ms. Sierra] was on drugs or something," but told the trial counsel she had never used drugs or been around people who were under the influence of drugs.[34]

Mrs. Foxtrot testified that she asked Ms. Sierra twice if she had been raped to which, on both occasions, Ms. Sierra replied "No. He tried to."[35] Ms. Sierra further told Mrs. Foxtrot she "invited a friend over" named "Dominic" and said that "[Appellant] was forcing her to drink wine and that [Appellant] had ended up taking her cellphone from her."[36]

After first responders arrived at the Foxtrot home, Ms. Sierra was taken, still naked except for the shirt provided to her by Mrs. Foxtrot, via ambulance to the hospital where she underwent a Sexual Assault Forensic Examination [SAFE]. The SAFE was delayed due to Ms. Sierra's high level of intoxication.[37] During the SAFE, Ms. Sierra declined to consent to a toxicology panel. The examiner observed a possible dried secretion on Ms. Sierra's left buttock, observed a small laceration on Ms. Sierra's labia minora, and took swabs from Ms. Sierra's body. The examiner then packaged up all evidence and swabs for submission to the U.S. Army Criminal Investigation Laboratory [USACIL].

Back at Ms. Sierra's residence, police officers entered her home to search for Appellant. They observed two empty wine bottles on the first floor and heard snoring coming from the upstairs bedroom. The officers then proceeded upstairs and found Appellant asleep in Ms. Sierra's bed. Appellant was naked and could not be roused until one of the officers lifted the mattress, causing Appellant to fall out of the bed and onto the floor. The officers then dressed Appellant in men's clothing they found in the bedroom and escorted him downstairs to the living room. Eventually they turned him over to the Provost Marshal's Office.

Several days later, Naval Criminal Investigative Service [NCIS] Special Agent [SA] Charlie interviewed Appellant regarding Ms. Sierra's allegations.

---

[33] R. at 654.

[34] R. at 655, 666.

[35] R. at 652, 655.

[36] R. at 653.

[37] R. at 851–52.

During his interview, Appellant told SA Charlie that he met up with Ms. Sierra, who told him that her husband was in the brig.[38] Appellant told SA Charlie that it was Ms. Sierra's idea to drink. While Appellant corroborated Ms. Sierra's description that they had consumed wine, beer, and Twisted Tea, he claimed that they each only had two glasses of wine.[39] Appellant further told investigators that Ms. Sierra and he drank the beers and Twisted Tea "normally."[40] He also corroborated Ms. Sierra's recollection that they had watched Netflix; however, he did not describe her as sitting on his lap.[41]

According to Appellant, Ms. Sierra became emotional after drinking heavily. She began complaining about her husband cheating on her, while crying and wailing hysterically. Appellant told SA Charlie that he became tired of hearing her complain about her husband and that he escorted her to bed. He said that he wrapped her arm around his shoulder and aided her up the stairs. He then described helping her to her bed and turning her over so that she would not throw up and potentially suffocate. He then claimed that he went back downstairs to continue to watch Netflix until he fell asleep on the living room floor.

According to Appellant, he next recalled being woken up by three local police officers who told him that they were there because of a "noise complaint."[42] Special Agent Charlie then asked Appellant, "Where did you and [Ms. Sierra] have sex?"[43] Appellant denied having sex with Ms. Sierra, resulting in SA Charlie asking him "Why would she tell us you did?"[44] When SA Charlie told Appellant he was found in Ms. Sierra's bed, Appellant expressed incredulity. Special Agent Charlie continued by telling Appellant that the local police officers had "body cams" that contradicted Appellant's claim that he was found by the police in the living room.[45] In fact, the officers had no body cameras. Appellant cross-examined Special Agent Charlie on this at trial, and while Special Agent Charlie acknowledged that he was allowed to lie to suspects during an

---

[38] Appellate Ex. XXXI at 31.

[39] *Id.*

[40] Pros. Ex. 8.

[41] *Id.*

[42] Appellate Ex. XXXI at 32.

[43] Pros. Ex. 8.

[44] *Id.*

[45] *Id.*

interview, he merely assumed that the local officers had body cameras and was surprised to learn that they did not.

Special Agent Charlie made several other statements during the interview, including: "you f***ed some guy's wife, we don't care" and "you had sex with her, we don't care."[46] He also repeated what the local police officers had told him about finding Appellant naked in Ms. Sierra's bed. These statements were included in the part of the recorded interview played for the members.

After the Government rested its case-in-chief, the Defense sought to elicit testimony from Major [MAJ] Whiskey, U.S. Army, a forensic psychologist. The testimony sought to show that Ms. Sierra's actions outside Mr. and Mrs. Fox-trot's house were consistent with someone who was under the influence of methamphetamine or some other stimulant.[47] Following argument by both parties, the military judge conducted a Military Rule of Evidence [Mil. R. Evid.] 403 balancing test and found that there was "no testimony of any type of drug that may or may not have been used. . . let alone something that carries with it the implications of methamphetamine."[48] She therefore ruled that while MAJ Whiskey could testify that Ms. Sierra's actions were generally consistent with someone under the influence of drugs, testimony concerning Ms. Sierra's use of any specific drug would be inadmissible.[49]

After the parties rested, the Defense sought the following instruction related to Appellant's NCIS interview:

> A recorded NCIS interview of the accused has been introduced into evidence in this trial. During the interview, any statements made by the NCIS agents are not to be considered by you as evidence of the accused's guilt. The statements made by the NCIS agents during the interview of the accused have not been introduced into evidence to prove the truth of the matters asserted in those statements. In fact, the statements made by the NCIS agents during the interrogation of the accused may be false and misleading. An NCIS agent conducting an interrogation of an accused may make false or misleading statements to the accused in order to further the aims of the interrogation. However, it is

---

[46] *Id.*

[47] R. at 971–73.

[48] R. at 976–77.

[49] *Id.*

not permissible for you members to rely on the NCIS agents statements as proof of the accused's guilt.[50]

During an Article 39(a) session, the military judge discussed instructions with the parties, and denied Appellant's requested instruction.[51] The military judge stated, "[T]he Court had provided a number of limiting instructions throughout the trial regarding the effect on the listener, so that was well known that the defense could have asked that at the time that the evidence was admitted. However, that went unopposed, and the Court is not inclined to limit the Court's consideration of an exhibit after [its] been admitted into evidence."[52]

Further facts necessary to resolve Appellant's assignments of error are addressed below.

## II. DISCUSSION

### A. The evidence is legally and factually sufficient

Appellant contends that the evidence is factually insufficient to support a conviction. We also review this (and every) case for legal sufficiency.

To determine legal sufficiency, we ask whether, "considering the evidence in the light most favorable to the prosecution, a reasonable fact-finder could have found all the essential elements beyond a reasonable doubt."[53] In conducting this analysis, "*all of the evidence* is to be considered in the light most favorable to the prosecution."[54]

For convictions for crimes that occurred prior to 2021, we review factual sufficiency de novo.[55] The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses," we are convinced of an appellant's guilt

---

[50] Appellate Ex. LXXXIX at 4.

[51] R. at 1068–69.

[52] *Id.*

[53] *United States v. Turner,* 25 M.J. 324, 324 (C.M.A. 1987) (citing *Jackson v. Virginia,* 443 U.S. 307, 319 (1979)).

[54] *Jackson*, 443 U.S. at 319 (internal citations omitted).

[55] Article 66(d)(1), UCMJ, 10 U.S.C. § 866(d)(1) (2019); *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017).

beyond a reasonable doubt.[56] We do not presume either innocence or guilt, and instead take "a fresh, impartial look at the evidence" to independently determine whether each element has been satisfied with proof beyond a reasonable doubt.[57] Proof beyond a reasonable doubt "does not mean the evidence must be free from conflict."[58]

To prove Appellant committed abusive sexual contact upon Ms. Sierra, the Government was required to show that: (1) Appellant committed sexual contact by touching Ms. Sierra's buttocks with his penis with an intent to gratify his sexual desire; (2) that he did so without Ms. Sierra's consent; and (3) that he did not reasonably believe that Ms. Sierra consented. Consent is a freely given agreement to the conduct at issue by a competent person.[59]

Appellant argues that the Government failed to prove Appellant's guilt beyond a reasonable doubt for two reasons: (1) it failed to prove that Ms. Sierra did not consent; and (2) it failed to prove that Appellant did not have a reasonable mistake of fact as to Ms. Sierra's consent. Both claims fail.

### 1. The Government proved that Ms. Sierra did not consent.

Appellant first claims that the Government failed to prove that Ms. Sierra did not consent to the charged sexual contact. According to Appellant, a number of facts demonstrate the possibility Ms. Sierra consented. First, Ms. Sierra was married and did not want her husband to think she had cheated on him. Second, Ms. Sierra had expressed a romantic interest in Appellant. Finally, Ms. Sierra's state of mind, given her alcohol induced blackouts, show that she simply did not remember consenting to the sexual contact.

This argument ignores or distorts the evidence presented at trial. The evidence, including testimony, shows Ms. Sierra did not consent to Appellant's acts. While she testified that she sat on Appellant's lap under a blanket watching a movie, she also testified that she was uncomfortable being there, that she did not want to be there, and that Appellant pulled her back down when she attempted to get up. More importantly, Ms. Sierra testified that later when she

---

[56] *Turner*, 25 M.J. at 325; *see also* Article 66(d)(1), UCMJ, 10 U.S.C. § 866(d)(1) (2017) ("In considering the record, the Court may weigh the evidence, judge the credibility of witnesses, and determine controverted questions of fact, recognizing that the trial court saw and heard the witnesses.").

[57] *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002).

[58] *United States v. Rankin*, 63 M.J. 552, 557 (N-M. Ct. Crim. App. 2006) (internal citation omitted).

[59] 10 U.S.C. 920(g)(7).

lay in bed during the time of the offense, she said, "no, stop" and that she was crying *as Appellant rubbed his penis on her buttocks*.[60] When asked why she was crying, she testified, "Because I did not want it to happen."[61]

While it is true that Ms. Sierra was married at the time of the offense, the evidence at trial showed that she made an almost immediate outcry, crossing the street naked in the middle of the night to report the assault to her neighbors whom she had never met before. This was not a situation in which, having had time for reflection, a woman alleged that a consensual act was non-consensual to preserve her marriage. Ms. Sierra testified clearly that she remembered the sexual activity and that she did not want Appellant to touch her the way that he did.

Finally, when questioned by law enforcement regarding Ms. Sierra's claims, Appellant expressly disavowed any claim that his encounter with Ms. Sierra was consensual and, instead claimed—unconvincingly—that no sexual contact occurred. Based on the record as a whole, the Government proved that Ms. Sierra did not consent to Appellant's sexual contact.

*2. The Government proved that Appellant did not have a reasonable mistake of fact that Ms. Sierra consented to the sexual contact.*

A mistake of fact as to consent in a case involving a charge of abusive sexual contact must be both honestly held by the accused and objectively reasonable.[62] Appellant's brief relies on numerous actions undertaken by Ms. Sierra to support his claim of a mistake of fact. These actions include but are not limited to: that Ms. Sierra drank wine with Appellant at her house; that Ms. Sierra did not tell Appellant that her husband was in the brig until after they met up; that Ms. Sierra sat on Appellant's lap; that she was in bed with him; and that they both were naked in the bedroom at the time of the sexual contact.

While each of these factors might, under some circumstances, inform a reasonable mistake of fact defense, the Government proved that the defense did not apply here. When questioned by law enforcement, Appellant categorically denied that he and Ms. Sierra had sex, or engaged in sexual activity. Rather, he described being annoyed by Ms. Sierra's behavior and claimed he helped her to bed because he was tired of hearing about her problems. The evidence

---

[60] R. at 566.

[61] R. at 567.

[62] R.C.M. 916(j)(1); *see also United States v. Rodela*, 82 M.J. 521, 526 (A.F. Ct. Crim. App. 2021).

instead showed that any claimed mistake of fact was neither reasonable nor honestly held under the facts of this case.

Accordingly, we are convinced beyond a reasonable doubt that the Government proved that Appellant was guilty of the charged offense.

## B. The military judge did not err by admitting a prior consistent statement.

We review a military judge's decision to admit evidence for an abuse of discretion.[63] "[The] abuse of discretion standard is a strict one, calling for more than a mere difference of opinion—[t]he challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous."[64] Military Rule of Evidence 801(d)(1)(B) permits admission of prior consistent statements made out of court in two different instances. The first is when offered, "to rebut an express or implied charge that the declarant recently fabricated" prior testimony, and the second is when offered "to rehabilitate the declarant's credibility as a witness when attacked on another ground."[65]

It is this second circumstance under which the military judge admitted Deputy Frank's testimony regarding what Ms. Sierra told him on the night of the alleged assault.[66] For a statement to be admissible under Mil. R. Evid. 801(d)(1)(B)(ii), the following factors must be met.

> (1) The declarant of the out-of-court statement testified;
>
> (2) The declarant was subjected to cross-examination about the prior statement;
>
> (3) The statement is consistent with the declarant's testimony;
>
> (4) The declarant's credibility as a witness was "attacked on another ground" other than the ones listed in Mil. R. Evid. 801(d)(1)(B)(i); and
>
> (5) The prior consistent statement is actually relevant to rehabilitate the witness's credibility on the basis on which . . . she was attacked.[67]

---

[63] *United States v. Frost,* 79 M.J. 104, 109 (C.A.A.F. 2019).

[64] *United States v. Hendricks,* 76 M.J. 283, 288 (C.A.A.F. 2017) (internal citation omitted).

[65] Mil. R. Evid. 801(d)(1)(B)(ii).

[66] R. at 833–37.

[67] *United States v. Finch,* 79 M.J. 389, 397 (C.A.A.F. 2020).

The rule "permits use of a prior consistent statement when a witness's credibility is attacked on grounds of faulty memory."[68]

Appellant claims that the military judge abused her discretion in permitting Deputy Frank to testify to Ms. Sierra's statements to him on the night of the assault because Deputy Frank's testimony was not consistent with Ms. Sierra's testimony at trial. Specifically, Appellant claims that Ms. Sierra only testified that she said "no" when Appellant tried to kiss her, and not when Appellant was committing the charged sexual contact.

We are unconvinced. Appellant's brief largely mischaracterizes the nature of the evidence by creating a sequence of events that the testimony does not support. The following is the section of the transcript relied upon by Appellant for his argument:

> Q: What did he rub in your vaginal area to your buttocks?
>
> A: His genitals.
>
> Q: His penis?
>
> A: Yes, sir.
>
> Q: Did you say anything to him?
>
> A: I did when he tried to kiss me, he kept trying to put his hand against my cheek and kept on trying to bring my face over to kiss him. And I said, "No, stop." And I pushed his face away.
>
> Q: Did he continue to grind against your buttocks after that?
>
> A: Yes, sir.
>
> Q: Were you crying at the time?
>
> A: Yes, sir.
>
> Q: Why?
>
> A: Because I didn't want it to happen.[69]

The military judge correctly found that Ms. Sierra's testimony was "attacked on another ground" i.e. her lack of memory.[70] The testimony elicited from Deputy Frank was consistent with Ms. Sierra's earlier testimony that she

---

[68] *United States v. Drinkert*, 81 M.J. 540, 554 (N-M Ct. Crim. App 2021).

[69] R. at 567; Appellant's Br. at 8-9.

[70] R. at 833-837.

told Appellant "no" as he assaulted her.[71] We therefore find no abuse of discretion in the military judge's admission of Ms. Sierra's prior consistent statement through Deputy Frank's testimony.

**C. The Military Judge Did Not Err in Restricting Major Whiskey's Testimony.**

Appellant argues that the military judge erred in restricting MAJ Whiskey's testimony. While the military judge ruled that the Defense could elicit testimony that Ms. Sierra's behavior was consistent with drug use generally, she excluded testimony regarding any specific drug that may have been used.[72] We review a military judge's admission or restriction of expert testimony for an abuse of discretion, following the framework set forth in *United States v. Ellis*:

> Mil. R. Evid. 702–705 and 403 operate to establish a simple four-part test for admissibility of expert testimony: (1) Was the witness qualified to testify as an expert? (2) Was the testimony within the limits of [the expert's] expertise? (3) Was the expert opinion based on a sufficient factual basis to make it relevant?, and (4) Does the danger of unfair prejudice created by the testimony outweigh its probative value?[73]

Here, the parties agree that the Defense-proffered testimony satisfied factors (1) and (2), but disagree as to factors (3) and (4). As an initial matter, we note that there was no testimony by any witness that they saw Ms. Sierra use any prescription or recreational drugs that night. The responding officers additionally did not see any drugs or drug paraphernalia when they went through Ms. Sierra's house.

Rather, Appellant seeks on appeal, as he did at trial, to "connect the dots" between the following: Ms. Sierra's text to Ms. Monroe that she was "getting her cats high"; Ms. Monroe's testimony that she *assumed* that Ms. Sierra meant she was using *marijuana*; Ms. Foxtrot's description of Ms. Sierra "picking" at her skin, refusing to put on clothes, and acting like she was "on drugs"; and Ms. Sierra declining a toxicology screen as part of her SAFE. We agree with the military judge that there was not a sufficient factual basis for MAJ Whiskey's proffered opinion that Ms. Sierra's behavior could be explained by methamphetamine use.

---

[71] R. at 835.

[72] R. at 975–77.

[73] 68 M.J. 341, 342 (C.A.A.F. 2010) (internal quotations and citations omitted).

However, even assuming that factor (3) of the aforementioned test was met, the military judge did not abuse her discretion in permitting MAJ Whiskey to testify only that Ms. Sierra's behavior was consistent with someone who had used drugs.[74] Not all evidence that is relevant is admissible, and a "military judge may exclude relevant evidence if its probative value is substantially outweighed by a danger of the following: unfair prejudice, confusing the issues, misleading the members, undue delay, wasting time, or needlessly presenting cumulative evidence."[75] When a military judge conducts a balancing test under Mil. R. Evid. 403, the military judge's ruling will be given more deference.[76] The military judge correctly conducted a Mil. R. Evid. 403 balancing test and found that testimony regarding methamphetamine or other specific drugs would have been substantially more prejudicial than probative.

Lastly, even assuming that the military judge erred, we find that Appellant was not prejudiced by the military judge's limitation. We evaluate prejudice from an erroneous evidentiary ruling by weighing (1) the strength of the Government's case, (2) the strength of the Defense case, (3) the materiality of the evidence in question, and (4) the quality of the evidence in question.[77]

Here, the Government's case was strong, with Ms. Sierra making an immediate outcry to her neighbors—whom she had never met—while naked and screaming that Appellant "tried to rape [her]."[78] When questioned by law enforcement, Appellant denied any sexual contact between himself and Ms. Sierra, a claim that was contradicted by the DNA evidence recovered from Ms. Sierra's body as well as injuries that tended to corroborate her claim of sexual contact with Appellant.

Correspondingly, the Defense case was weak, and focused on attacking Ms. Sierra's memory while alternatively positing that she had consented, that Appellant reasonably believed she had consented, or that there had been no sexual contact at all. Furthermore, the evidence excluded was not critical to Appellant's case. Appellant was permitted to elicit evidence that Ms. Sierra's distress at her neighbor's house was consistent with drug use, and in fact did so. Major Whiskey additionally testified that Ms. Sierra's behavior was also consistent with hallucinations or a psychotic break. We fail to see how testimony that Ms. Sierra's actions were consistent with methamphetamine specifically

---

[74] *Ellis*, 68 M.J. at 342.

[75] Mil. R. Evid. 403.

[76] *United States v. Manns*, 54 M.J. 164, 166 (C.A.A.F. 2000).

[77] *United States v. Kerr*, 51 M.J. 401, 405 (C.A.A.F. 1999).

[78] R. at 651-52, 655.

would have been any more effective than the testimony already elicited. We therefore find no merit in Appellant's third AOE.

**D. Assuming that the military judge erred by not providing a limiting instruction for statements by Special Agent Charlie, Appellant was not prejudiced by the error.**

"When deciding whether the military judge properly instructed a panel, this Court uses a de novo standard of review."[79] Appellant argues that the military judge erred in not providing an instruction regarding whether law enforcement can lie to suspects as well as not providing a limiting instruction on the proper use of the statements of the interrogators.

The military judge declined to provide Appellant's requested instruction, stating that the interrogation had been admitted and published to the members without objection, and that the requested limiting instruction was untimely. Military Rule of Evidence 105 provides that "If the military judge admits evidence that is admissible against a party or for a purpose—but not against another party or for another purpose—the military judge, on timely request, must restrict the evidence to its proper scope and instruct the members accordingly."[80] While Mil. R. Evid. 105 does not define what a "timely request" is, Rule for Courts-Martial 920(f) provides useful context stating, in general, "[f]ailure to object to an instruction or to omission of an instruction before the members close to deliberate forfeits the instruction."[81]

Limiting instructions are an important tool to "ensure that the testimony is not transformed from evidence introduced for [a] limited purpose . . . into substantive evidence introduced for the purpose of establishing a truth of the matter."[82] "Limiting instructions are particularly important when evidence that is inadmissible, or admissible for only a limited purpose, involves a discrete fact or set of facts."[83]

In this case, we will assume without deciding that the military judge erred in denying Appellant's request for a limiting instruction after the evidence was

---

[79] *United States v. Bailey*, 77 M.J. 11, 14 (C.A.A.F. 2017) (citing *United States v. Schroder*, 65 M.J. 49, 54 (C.A.A.F. 2007).

[80] Mil. R. Evid. 105.

[81] R.C.M. 920(f).

[82] *United States v. Lusk*, 70 M.J. 278, 282 (C.A.A.F. 2011).

[83] *Id.* (see *Adamson v. Cathel*, 633 F.3d 248, 256 (3d Cir. 2011).

admitted without objection, but before the members closed for deliberations. Doing so, we find that any error was not prejudicial.

Appellant acknowledges that the military judge's alleged error was of a non-constitutional nature, and we agree.[84] Because any failure to give the Defense requested instruction would be non-constitutional error, the test for harmlessness is whether the instructional error had "substantial influence" on the findings.[85] "If it did, or if we are 'left in grave doubt, the conviction cannot stand.'"[86]

Here, we conclude that the failure to give the Defense requested instruction did not have a substantial influence on the findings. As noted above, the Government's case was strong with an immediate outcry by the victim to her neighbors under circumstances that would not suggest any motive to fabricate.

Appellant cites to *United States v. Kitching* for support for his argument that the military judge's error was prejudicial.[87] In *Kitching,* the court found that the failure of the trial judge to give a limiting instruction for "have you heard" questions regarding uncharged misconduct to challenge the basis for a defense witness's opinion of the accused was prejudicial. The facts at play in *Kitching* are simply not analogous to the facts in this case. Here, the statements by the investigators that were hearsay and objectionable were all directly related to the misconduct at issue. In addition, each of the declarants of the hearsay statements testified at trial. Appellant was afforded the opportunity to, and did, vigorously cross-examine each declarant.

Having considered the record as a whole and Appellant's AOE , we are convinced that any error by the military judge in failing to give the requested instructions did not have a substantial influence on the findings and was therefore harmless. We accordingly reject Appellant's fourth AOE.

---

[84] Appellant's Br. at 51, n. 221.

[85] *United States v. Gibson*, 58 M.J. 1, 7 (C.A.A.F. 2003).

[86] *Id.* (citing *Kotteakos v. United States*, 328 U.S.750, 765, 90 L. Ed. 1557, 66 S. Ct. 1239 (1946)).

[87] 23 M.J. 601 (A.F.C.M.R. 1986) (internal citations omitted).

**E. Appellant was not denied a fair trial due to cumulative error.**

The cumulative effect of all plain errors and preserved errors is reviewed de novo.[88] "Under the cumulative error doctrine, 'a number of errors, no one perhaps sufficient to merit reversal, in combination necessitate the disapproval of a finding.'"[89] We will reverse only if we find any cumulative errors to have denied the appellant a fair trial.[90]

In this case, we have presumed error for only one of Appellant's AOEs (and we found that presumed error to be harmless). As a result, the cumulative error doctrine does not apply.

## III. CONCLUSION

After careful consideration of the record and briefs of appellate counsel, we have determined that the findings and sentence are correct in law and fact and that no error materially prejudicial to Appellant's substantial rights occurred.[91] The findings and sentence are **AFFIRMED.**

FOR THE COURT:

MARK K. JAMISON
Clerk of Court

---

[88] *United States v. Pope*, 69 M.J. 328, 335 (C.A.A.F. 2011) (internal citation omitted).

[89] *Id.* (citing *United States v. Banks*, 36 M.J. 150, 170-71 (C.M.A. 1992)).

[90] *Id.* (citing *Banks*, 36 M.J. at 171).

[91] Articles 59 & 66, UCMJ.