# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 40531**

————————————

**UNITED STATES**
*Appellee*

**v.**

**John A. EVANGELISTA**
Airman First Class (E-3), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 5 November 2025

————————————

*Military Judge*: Lance R. Smith.

*Sentence*: Sentence adjudged 19 May 2023 by GCM convened at Royal Air Force Lakenheath, United Kingdom. Sentence entered by military judge on 7 September 2023: Dishonorable discharge, confinement for 17 months and 30 days, forfeiture of all pay and allowances, reduction to E-1, and a reprimand.

*For Appellant*: Major Trevor N. Ward, USAF; Joshua A. Hill, Esquire.

*For Appellee*: Colonel Matthew D. Talcott, USAF; Lieutenant Colonel J. Pete Ferrell, USAF; Lieutenant Colonel Jenny A. Liabenow, USAF; Major Kate E. Lee, USAF; Major Jocelyn Q. Wright, USAF; Mary Ellen Payne, Esquire.

Before GRUEN, PERCLE and MORGAN, *Appellate Military Judges*.

Senior Judge GRUEN delivered the opinion of the court, in which Judge PERCLE and Judge MORGAN joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

GRUEN, Senior Judge:

A general court-martial composed of officer and enlisted members convicted Appellant, contrary to his pleas, of one specification of sexual assault without consent of JJ, and two specifications of abusive sexual contact without consent of TL, in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920.[1,2] The members sentenced Appellant to a dishonorable discharge, confinement for 17 months and 30 days, forfeiture of all pay and allowances, reduction to the grade of E-1, and a reprimand. Appellant requested the convening authority defer the adjudged reduction in grade and forfeitures until entry of judgment. The convening authority denied both requests, took no action on the findings, and approved the sentence in its entirety.

Appellant raises five issues on appeal, which we have reworded and combined leaving four issues: (1) whether Appellant's conviction for sexual assault against JJ is legally and factually sufficient; (2) whether Appellant's convictions for abusive sexual contact against TL are legally and factually sufficient; (3) whether the military judge abused his discretion by excluding evidence under Mil. R. Evid. 412 regarding JJ and TL; and (4) whether trial defense counsel were ineffective. Additionally, we consider an issue not raised by Appellant: (5) whether Appellant is entitled to relief for a presumptively unreasonable post-trial delay of over 18 months between docketing and our decision in this case.

On 7 October 2024, the United States Court of Appeals for the Armed Forces (CAAF) issued their opinion in *United States v. Mendoza*, 85 M.J. 213 (C.A.A.F. 2024), where they found that a charge of sexual assault without consent is a separate theory of liability from a charge of sexual assault upon a person incapable of consenting. In *Mendoza*, the CAAF held that in "without consent" cases, evidence of a victim's level of intoxication may be relevant and admissible, *id.* at *22; however, it is improper to use this evidence "as proof of [a victim's] inability to consent and therefore proof of absence of consent" in these cases. *Id.* On 20 August 2025, the CAAF analyzed *United States v. Casillas* in light of *Mendoza*, a case where initial penetration had occurred while the victim was sleeping or otherwise incapable of consenting, but the victim awoke during the sex act, was determined to have been capable of consenting in that

---

[1] Unless otherwise noted, all references to the UCMJ, Rules for Courts-Martial, and Military Rules of Evidence (Mil. R. Evid.) are to the *Manual for Courts-Martial, United States* (2019 ed.).

[2] Appellant was acquitted of three specifications of abusive sexual contact without consent and two specifications of sexual assault without consent, in violation of Article 120, UCMJ.

moment, yet did not consent, and found that conviction was legally sufficient. __ M.J. __, No. 24-0089, 2025 CAAF LEXIS 692, at *4 (C.A.A.F. 20 Aug. 2025).

We have considered *Mendoza* and *Casillas* in analyzing Appellant's convictions for sexual assault upon JJ and abusive sexual contact upon TL and find the convictions are legally and factually sufficient. Additionally, we do not find the military trial judge abused his discretion by excluding evidence under Mil. R. Evid. 412, and find trial defense counsel were not ineffective. We find no error materially prejudicial to Appellant's substantial rights and affirm the findings and sentence.

# I. BACKGROUND

Appellant entered the United States Air Force in November 2020. In July 2021, Appellant was ordered to serve as a jet engine mechanic at Royal Air Force (RAF) Lakenheath, United Kingdom. It is in the United Kingdom (England) where Appellant met the individuals involved in this case to include JJ and TL, the named alleged victims in the specifications of which he stands convicted.[3]

## A. Sexual Assault Without Consent of JJ

On 19 August 2021, Appellant went to a social club at RAF Lakenheath for drinks with friends, one of whom was JJ. JJ was an Airman stationed at RAF Mildenhall and a friend of Appellant. At this social club, Appellant, JJ, and others in their friend group drank alcohol and socialized—much of which was captured via cell phone videos taken throughout the evening or text messages sent amongst the friends. After some time, a few of the friends, to include JJ and Appellant, left the social club and went back to the dorms on RAF Lakenheath to attend a day-room party. While there, JJ consumed alcohol until she felt "very drunk." Because JJ did not live at RAF Lakenheath, she and her male friend CS agreed that when they were ready to retire for the evening, JJ would stay in CS's dorm room with another of their friends AC, a civilian female. CS stayed in a different dorm room, not his own. When JJ and AC left the day-room party, they, along with DW and Appellant, went to DW's room. When they left DW's room, JJ and AC left to retire to CS's room for the night; Appellant went with them.

JJ testified that she did not know why Appellant went with them to CS's room since "it was usually girls sharing a room." JJ assumed Appellant would go back to his own room to sleep since it was "less than a minute" away from CS's room. When they arrived at CS's room, JJ changed into an oversized t-

---

[3] At the time of the alleged offenses both TL and JJ were enlisted members of the United States Air Force.

shirt and underwear, she ate some food that AC made for her, she watched some videos while sitting on the bed, and then JJ fell asleep with AC also on the bed. Appellant was not in bed with them when JJ fell asleep.

Sometime after JJ had fallen asleep, she awoke because she "felt a hand in [her] underwear." Even though she felt "[v]ery tired, intoxicated, and frozen," "she was able to comprehend" that AC had been laying to her left, and that the hand was coming from the right. JJ testified that she laid there "frozen in fear," while she felt Appellant's hand "crawling" from her stomach into her underwear, where she felt "fingers on [her] clit[oris] and then fingers going inside of [her] vagina." JJ explained that she had "never been touched like that before" and that she was scared. Even though she "knew and felt what was happening," she "couldn't move." JJ explained that she said nothing while this was happening to her and at some point, in her frozen state, she fell back to sleep.

The next morning JJ awoke confused and saw Appellant still in the bed with her and AC; Appellant was on JJ's right side. JJ questioned herself and what she had experienced during the night because she thought Appellant was homosexual and she considered him to be her "gay best friend." She thought she could trust him. She knew there was no one else who had been in the room at the time of the assault except for AC and Appellant, but still she "tried to forget about it and talk [herself] out of it ever happening" because she "didn't want to believe what had happened actually happened."

JJ testified that she experienced alcohol induced blackouts during the evening of 19 August 2021, and that such blackouts had happened to her before. She admitted there were parts of the night she could not remember, but she was adamant that she knew what she experienced when she awoke in CS's room in the middle of the night, and that sometime later, it became clear to her that it was Appellant who had assaulted her.

A couple of days after this incident on 21 August 2021, Appellant and JJ were again partying with friends at the dorms on RAF Lakenheath. Once again, JJ drank excessively and became very drunk. At some point during this party, Appellant "dragged [JJ] away from the party" and took her to the room where she had planned to sleep for the night. Again, JJ experienced alcohol induced blackouts throughout the night. Again, Appellant performed sexual acts on JJ which JJ did not consider consensual.[4] The next morning, JJ testified she was "in denial" and "didn't know what to do" and tried to act "as normal as [she] could." Although she did not think anyone would believe her, after the interactions with Appellant on 21 August 2021, she confided in a couple of her

---

[4] The sexual acts that occurred between JJ and Appellant on 21 August 2021 were captured in specifications of which Appellant was acquitted.

friends, to include AC, that she believed Appellant had assaulted her and a few weeks later reported the sexual assault incidents from both 19 August 2021 and 21 August 2021 to the Air Force Office of Special Investigations (OSI).

Sometime after these events, JJ was diagnosed with borderline personality disorder (BPD). At the court-martial, Dr. EB was called to testify, qualified without objection as an expert in the field of forensic psychology, and offered testimony about false memories, the effects of alcohol on memory, and how BPD can affect a person's memory and behavior. Dr. EB did not personally diagnose JJ.

## B. Abusive Sexual Contact of TL

On 4 July 2021, Appellant met TL for the first time at a social club on RAF Lakenheath. They became friends and according to TL, the friendship was strictly platonic. On 12 August 2021, Appellant messaged TL and told her that he "wasn't doing okay," and asked if he could meet her at her dorm room. While TL was in for the night and getting ready to go to sleep, she did not want to turn him away if he needed her. Appellant went to TL's room and upon opening the door and seeing Appellant, TL saw that he was distraught and had "leftover tears on his face." TL hugged Appellant and he began to "cry a little bit." TL let Appellant into her dorm room to console him.

While in TL's room, Appellant laid down on TL's bed with her and cried silently for about ten minutes while TL held him. According to TL, once Appellant calmed down, she stopped embracing him. Appellant then told TL that his grandmother had passed away and asked for another hug, to which TL complied. The conversation became more "lighthearted" and they began to talk about each other's love lives and sexual experiences. It was at that time that Appellant "touched [TL's] buttocks the first time."[5] Appellant's hand was not on her buttocks long because "[a]s soon as it got into position, [she] pushed it away." When she pushed it away, she said to Appellant, "Hey, we are not those kinds of friends." Appellant responded saying, "I'm sorry. I'm sorry. I know I'm blacklisted. I'm sorry." Amongst the friend group it was understood that "blacklisted" meant that one would not be in any sort of a relationship or sexual relationship with a "blacklisted" person. After this interaction, the two remained lying on TL's bed facing each other and talking.

---

[5] Appellant was charged with touching TL's buttocks with his hand on divers occasions. The panel members found him guilty except the words "on divers occasions," and of the excepted words not guilty. The members' Findings Worksheet (Appellate Exhibit XLV) confirmed the single touch they found Appellant committed and of which he was guilty was "the second buttock touch with his hand."

Appellant made a comment to TL while apologizing acknowledging that he understood TL was abstinent at the time. At some point, TL explained that a former boyfriend did not want to see her anymore. Appellant responded by telling TL that "if [he] were to have sex with [her], [he] would do it like this," and then he moved TL into "the missionary position." TL was not expecting this to happen and testified that "[his] arms were sort of holding [her] legs into place. He was on his knees at [that] point and he was leaning in to [her]." At this point, TL "could feel the pressure of his groin area against [her] groin area." She could feel Appellant's penis and believed he had an erection at that point. All of this happened very quickly and TL "just kept the momentum going and swooped [her] legs down and [she] sat up to separate [their] groin areas." Once again, TL told Appellant, "[Hey], again, we are not those kinds of friends." Again, Appellant apologized. At some point Appellant touched TL's buttocks for a second time. TL did not make Appellant leave her room and although she felt uncomfortable by these interactions, she did not think at the time that Appellant had done anything wrong.

During OSI's investigation of Appellant, TL was called in to be interviewed by OSI agents as a character witness for Appellant. TL initially had no intention of disclosing the 12 August 2021 interactions between her and Appellant. However, at some point during the interview, TL decided it would be "a good event for [OSI] to know." TL testified that she "knew the incident that happened" between her and Appellant was wrong and that she had been "in denial for a long time." She was "mad at [herself]" for not "stand[ing] up for [her]self." Even though TL considered Appellant to have been a close friend before the interactions on 12 August 2021, that evening was the last time TL and Appellant hung out together socially.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

#### 1. Law

##### *a. Legal and Factual Sufficiency*

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v.*

*Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (alteration in original) (citation omitted). The test for legal sufficiency "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *United States v. Oliver*, 70 M.J. 64, 68 (C.A.A.F. 2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1973)).

We review questions of factual sufficiency when an appellant asserts an assignment of error and makes a specific showing of a deficiency in proof. *United States v. Harvey*, 85 M.J. 127, 130 (C.A.A.F. 2024) (citing Article 66(d)(1)(B)(i), UCMJ, 10 U.S.C. § 866(d)(1)(B)(i), *Manual for Courts-Martial, United States* (2024 ed.) (2024 *MCM*)). The current version of Article 66(d)(1)(B), UCMJ, Factual Sufficiency Review, states:

> (i) In an appeal of a finding of guilty under subsection (b), the Court may consider whether the finding is correct in fact upon a request of the accused if the accused makes a specific showing of a deficiency of proof.

> (ii) After an accused has made a showing, the Court may weigh the evidence and determine controverted questions of fact subject to—

> (I) appropriate deference to the fact that the trial court saw and heard the witnesses and other evidence; and

> (II) appropriate deference to findings of fact entered into the record by the military judge.

> (iii) If, as a result of the review conducted under clause (ii), the Court is clearly convinced that the finding of guilty was against the weight of the evidence, the Court may dismiss, set aside, or modify the finding, or affirm a lesser finding.

10 U.S.C. § 866(d)(1)(B) (2024 *MCM*). This factual sufficiency standard applies to courts-martial in which every finding of guilty in the entry of judgment is for an offense occurring on or after 1 January 2021. *See* The National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, § 542(e)(2), 134 Stat. 3388, 3612–13 (2021).

"[T]he requirement of 'appropriate deference' when a [Court of Criminal Appeals (CCA)] 'weigh[s] the evidence and determine[s] controverted questions of fact' . . . depend[s] on the nature of the evidence at issue." *Harvey*, 85 M.J. at 130 (third and fourth alterations in original). It is within this court's discretion to determine what level of deference is appropriate. *Id*.

"[T]he quantum of proof necessary to sustain a finding of guilty during a factual sufficiency review is proof beyond a reasonable doubt, the same as the quantum of proof necessary to find an accused guilty at trial." *Id*. at 131 (internal quotation marks omitted).

For this court "to be 'clearly convinced that the finding of guilty was against the weight of the evidence,' two requirements must be met." *Id*. at 132. First, the CCA "must decide that the evidence, *as the CCA has weighed it*, does not prove that the appellant is guilty beyond a reasonable doubt." *Id.* Second, we must be clearly convinced of this decision. *Id.*

The elements of sexual assault without consent, in violation of Article 120, UCMJ, are: (1) that an accused committed a sexual act upon another person; and (2) that an accused did so without the consent of the other person. *Manual for Courts-Martial, United States* (2019 ed.) (*MCM*), pt. IV, ¶ 60.b.(2)(d).

The elements of abusive sexual contact without consent, in violation of Article 120, UCMJ, are: (1) that an accused committed sexual contact act upon another person; and (2) that an accused did so without the consent of the other person. *MCM*, pt. IV, ¶ 60.b.(4)(d).

### b. The **Mendoza** *Issue*

Appellant was convicted of sexual assault of JJ without consent, in violation of Article 120, UCMJ. As charged, the Government was required to prove the following elements beyond a reasonable doubt: (1) that Appellant committed a sexual act upon JJ by penetrating her vulva with his finger with an intent to gratify his sexual desire; and (2) that Appellant did so without JJ's consent. *MCM*, pt. IV, ¶ 60.b.(2)(d).

A charge of sexual assault without consent is a separate theory of liability from a charge of sexual assault upon a person incapable of consenting. *See Mendoza*, 85 M.J. at 220. A charge of sexual assault of a person who is asleep, unconscious, or otherwise unaware the act is occurring is likewise a separate theory of liability from a charge of sexual assault without consent. *Compare MCM*, pt. IV, ¶ 60.b.(2)(d) (without consent) *with MCM*, pt. IV, ¶ 60.b.(2)(e) (sleeping victim). A charge of sexual assault upon a person who was asleep alleges criminal conduct upon a person who "was asleep" when the sexual act was occurring and that "the [Appellant] knew or reasonably should have known that the other person was asleep" when "the sexual act was occurring."

*MCM*, pt. IV, ¶ 60.b.(2)(e). A charge of sexual assault without consent alleges criminal conduct "upon a victim who is capable of consenting but does not consent." *Mendoza*, 85 M.J. at 220.

In "without consent" cases, evidence of a victim's level of intoxication may be relevant and admissible, *id.* at 222; however, it is improper to use this evidence "as proof of [a victim's] inability to consent and therefore proof of absence of consent" in these cases. *Id.* In other words, what "the Government cannot do is prove the absence of consent under Article 120(b)(2)(A), UCMJ, [10 U.S.C. § 920(b)(2)(A),] by merely establishing that the victim was too intoxicated to consent." *Id.*

"[F]indings of guilt may be based on direct or circumstantial evidence . . . ." *Id.* at 218 (internal quotation marks omitted) (citing Rule for Courts-Martial (R.C.M.) 918(c)). "[T]he absence of direct evidence of an element of an offense does not prevent a finding of guilty for that offense from being legally sufficient." *Id.*

### c. Defense of Reasonable Mistake of Fact as to Consent from JJ and TL

"[I]t is a defense to an offense that the accused held, as a result of ignorance or mistake, an incorrect belief of the true circumstances such that, if the circumstances were as the accused believed them, the accused would not be guilty of the offense." R.C.M. 916(j)(1). If the mistake goes to an element requiring general intent or knowledge, it "must have existed in the mind of the accused and must have been reasonable under all the circumstances." *Id.* Therefore, an honest and reasonable mistake that the victim consented to the charged sexual contact is an affirmative defense to the charged offense. *See*, *e.g.*, *United States v. McDonald*, 78 M.J. 376, 379 (C.A.A.F. 2019) (considering the defense of mistake of fact to a charge of sexual assault). Once raised, the Government bears the burden to prove beyond a reasonable doubt that the defense does not exist. R.C.M. 916(b)(1); *see McDonald*, 78 M.J. at 379.

In considering whether the defense of mistake of fact as to consent was raised at trial, we "consider the totality of the circumstances at the time of the offense" and consider "whether the record contains some evidence of an honest and reasonable mistake to which the [factfinder] could have attached credit if they had so desired." *United States v. Hibbard*, 58 M.J. 71, 75 (C.A.A.F. 2003) (citations omitted). While the quantity of evidence required is low, the record must contain evidence supporting both the subjective "honest" and the objective "reasonable" mistaken belief. *See United States v. Davis*, 76 M.J. 224, 230 (C.A.A.F. 2017) (citation omitted) ("[W]hile [the a]ppellant's statement may constitute a scintilla of evidence about his 'honest belief,' . . . there is not an iota of evidence that such a belief was reasonable."); *see also United States v.*

*Willis*, 41 M.J. 435, 438 (C.A.A.F. 1995) (citation omitted) ("The testimony relied on by appellant tended to show objective circumstances upon which a reasonable person might rely to infer consent. However, they provided no insight as to whether appellant actually or subjectively did infer consent based on these circumstances.").

When determining what is reasonable, we know that "'[d]ue care' is 'such care as would be exercised by an ordinarily prudent [person] when sober.'" *United States v. Harrington*, No. ACM 39825, 2021 CCA LEXIS 524, at *17 (A.F. Ct. Crim. App. 14 Oct. 2021) (unpub. op.) (second alteration in original) (quoting *United States v. Bragg*, 4 C.M.R. 778, 782 (A.F.C.M.R. 1952), then citing RESTATEMENT (SECOND) OF TORTS § 283C cmt. d (AM. LAW INST. 1965) ("[I]f a drunken person's 'conduct is not that of a reasonable man who is sober, his voluntary intoxication does not excuse' conduct that would otherwise be negligent.")), *rev'd on other grounds*, 83 M.J. 408 (C.A.A.F. 2023); *see also United States v. Moore,* No. ACM S32477, 2018 CCA LEXIS 560, at *12 (A.F. Ct. Crim App. 11 Dec. 2018) (unpub. op.) (citation omitted) ("This defense has two elements: one subjective and one objective. For the subjective element, the ignorance or mistake must have existed in [the a]ppellant's mind. For the objective test, the ignorance or mistake must be reasonable under all the circumstances as assessed by an ordinary, prudent, sober adult.").

The concept of "reasonably prudent person" is an objective standard. *Harrington*, unpub. op. at *17. "The actor is required to do what this ideal individual would do in his place. The reasonable man is a fictitious person, who is never negligent, and whose conduct is always up to standard." *Id.* at *18 (citing RESTATEMENT (SECOND) OF TORTS § 283 cmt. c (AM. LAW INST. 1965)); s*ee also Military Judges' Benchbook* (hereinafter *Benchbook*), Dept. of Army Pamphlet 27-9 at 1425 (29 Feb. 2020) ("A reasonable belief is one that an ordinary, prudent, sober adult would have under the circumstances."). "Voluntary intoxication does not permit what would be an unreasonable belief in the mind of a sober person to be considered reasonable because the person is intoxicated." *Benchbook*, at 1425–26.

In *United States v. Greaves*, our superior court's predecessor stated,

> It would seem that one is not being reasonable if one is being reckless or negligent. Thus it would seem that for one reasonably to believe something, one must have taken such measures as to not be reckless or negligent with respect to the truth of the matter. In other words, one must be seen as exercising due care with respect to the truth of the matter in issue.

40 M.J. 432, 437 n.5 (C.M.A. 1994). "If a mistake is honest yet 'patently unreasonable,' the defense is unavailable to an appellant." *United States v. Rodela*, 82 M.J. 521, 526 (A.F. Ct. Crim. App. 2021) (quoting *Davis*, 76 M.J. at 230).

### 2. Analysis

Appellant alleges that his convictions for sexual assault without consent against JJ and abusive sexual contact against TL are legally and factually insufficient. Viewing the evidence in totality, we find the evidence is both legally and factually sufficient to support the convictions of sexual assault and abusive sexual contact as charged.

### a. Sexual Assault Upon JJ

Appellant was convicted of sexual assault of JJ without consent, in violation of Article 120, UCMJ. As charged, the Government was required to prove the following elements beyond a reasonable doubt: (1) that Appellant committed a sexual act upon JJ by penetrating her vulva with his finger with an intent to gratify his sexual desire; and (2) that Appellant did so without JJ's consent. *MCM*, pt. IV, ¶ 60.b.(2)(d). Per *Mendoza*, the Government was required to prove that JJ did not consent to sexual conduct with Appellant at a time when she was capable of consenting. The Government's proof supporting the conviction for sexual assault (Specification 6 of the Charge) was primarily based on JJ's testimony, corroborating evidence from the testimonies of DW and AC, as well as documentary and video evidence.

Appellant alleges three theories to support his claim of legal and factual insufficiency: (1) there is insufficient evidence that he penetrated JJ's vulva with his finger; (2) even if the Government proved Appellant had digitally penetrated JJ's vulva, they failed to disprove that he had a reasonable mistake of fact as to consent; and (3) the Government failed to prove that JJ was "capable of consenting," yet did not consent as required by *Mendoza*. The basis for all three of these contentions is Appellant's assertion that JJ "has almost zero credibility as a complainant" and "there is no independent evidence to corroborate her allegation." Appellant argues JJ lacks credibility because JJ's level of intoxication on the evening of 19 August 2021, leading to her experiencing fragmentary alcohol-induced blackouts throughout the evening and into the following morning; and the diagnosis of BPD, of which JJ had been diagnosed sometime after the incident on 19 August 2021.

While Appellant's arguments rely heavily on JJ's level of intoxication, JJ was forthcoming about her drinking that evening and the effects alcohol had on her. JJ testified at trial and conceded that on the evening of 19 August 2021, she was "very drunk." She also conceded that she had fragmentary blackouts throughout the night—meaning some events she could remember, and others she could not. Even acknowledging she lost memory of some events, she was

certain that some events were very clear to her. For example, she did not remember how much she drank at the dorm party after they left the social club, she did not remember her friends giving her Gatorade shots, and she did not recall how she got to CS's dorm room—the dorm room where she and CS had previously agreed she would stay with AC, her civilian female friend after their night of partying since JJ did not live on RAF Lakenheath. However, JJ did remember many events of the evening. For example, JJ remembered Appellant going with her and AC to CS's room, and she remembered that she did not know why Appellant went with them to CS's room since "it was usually girls sharing a room." JJ also remembered that when they got to CS's room, JJ changed into an oversized t-shirt and underwear, she ate some food that AC had made for her, she watched some videos while sitting on the bed, and then she fell asleep with AC also in the bed on her left side. JJ recalled that when she fell asleep, Appellant was not in bed with her and AC.

Sometime after JJ fell asleep, she awoke because she "felt a hand in [her] underwear." Even though she felt "[v]ery tired, intoxicated, and frozen," "she was able to comprehend" that the hand was coming from the right. JJ testified that she laid there "frozen in fear," while she felt Appellant's hand "crawling" from her stomach into her underwear, where she felt "fingers on [her] clit[oris] and then fingers going inside of [her] vagina." JJ explained that she had "never been touched like that before" and that she was scared. Even though she "knew and felt what was happening," she "couldn't move." JJ explained that she said nothing while this was happening to her and at some point, in her frozen state, she fell back to sleep.

At trial, JJ was cross-examined on her memory of what occurred and her certainty about who sexually assaulted her. Trial defense counsel highlighted statements JJ made to OSI in an attempt to show JJ was unsure if Appellant was the perpetrator. For example, JJ had stated she was not sure who it was touching her "as it happened" and conceded that she was confused by Appellant's conduct because she thought Appellant was homosexual and she considered him to be her "gay best friend." She thought she could trust him. In this connection, and even though when JJ awoke and saw Appellant still in the bed on her right side, she questioned herself and what she had experienced during the night. These concessions lose the weight Appellant assigns them when viewed in light of JJ's testimony that Appellant was on JJ's right side when she awoke the next morning; JJ felt the perpetrator's hand coming from her right side during the assault; there was no reason to believe nor evidence supporting AC was the perpetrator; and it was only the three of them in the bed when JJ awoke the next morning. Moreover, when challenged as to whether JJ was certain she was assaulted, she testified that she knew "[i]t happened" and there was "no doubt" in her mind that she felt digital penetration that she did not consent to.

We also give little weight to Appellant's contention that JJ lacked credibility because she experienced fragmentary alcohol-induced blackouts throughout the night. While Appellant claims JJ had "no reliable memory of the event," JJ actually testified to the memories she had. JJ was not testifying to having no memory whatsoever. The expert forensic psychologist Dr. EB who testified for the Defense described two types of blackouts: fragmentary blackouts and en bloc blackouts. Dr. EB distinguished fragmentary blackouts from en bloc blackouts, describing fragmentary blackouts as being more common and en bloc blackouts as rare. JJ had what Dr. EB described as a fragmentary blackout, which would include "little pieces of memory," and is more common. In JJ's case, some of the "little pieces of memory" included the assault she experienced and which she was able to describe in detail.

We are equally unpersuaded by Appellant's contention that the conviction of sexual assault upon JJ is rendered factually insufficient because the Government offered "no independent evidence to corroborate [JJ's] allegation." Proof beyond a reasonable doubt does not require corroboration from scientific evidence or eyewitness testimony; the law is settled that "[t]he testimony of only one witness may be enough." *United States v. Rodriguez-Rivera*, 63 M.J. 372, 383 (C.A.A.F. 2006). While the Government did not offer evidence Appellant asserts was required, such as deoxyribonucleic acid (DNA), blood alcohol content (BAC) results, video, audio, or eyewitness testimony of the assault while being committed, they did in fact offer corroborating evidence. In addition to multiple videos and documentary evidence, the Government called corroborating witnesses and elicited testimony by DW and AC to corroborate JJ's recollections of the evening.

DW testified about the evening on 19 August 2021. He was not drinking and remembered seeing both JJ and AC drinking heavily throughout the night. He left the social club with JJ and went to the day room party with her. He corroborated JJ's account of her drinking to the point of becoming "very drunk" while at the day room party before retiring to CS's room for the night. DW further testified JJ "[had] difficulty with motor function" and that "she had dropped a beer bottle" and "had difficulties speaking." DW further stated that JJ "would blackout while sitting or standing, leading [others] to have to catch her." He clarified that what he meant by "blackout" was that "for about five seconds at a time [JJ] would go unconscious" and someone would "have to catch her so she did not injure herself." JJ would then "come to, seemingly fully conscious." According to DW, Appellant was "one of the people assisting, making sure that [JJ] did not injure herself." AC was another person assisting JJ while she was in her drunken state. At some point, JJ requested to leave the day-room party with DW, but Appellant stated "he was not comfortable with that" because DW was new to the friend group. Because of this, Appellant, AC, and another Airman accompanied DW and JJ to DW's dorm room. Shortly

thereafter, Appellant, JJ, AC, and the other Airman left DW's room and DW did not know where they went or what they did the rest of the evening.

AC also testified about the evening of 19 August 2021. Her testimony also supported much of JJ's testimony. Because AC stayed in the same room with JJ and Appellant, she was able to corroborate JJ's recollection of what occurred when they retired to CS's room for the night. AC was the one who prepared food for JJ and observed what was occurring before JJ fell asleep. Although JJ seemingly fell asleep before Appellant got into the bed, AC testified that before she herself fell asleep, she told Appellant "he should go to bed," at which point Appellant got into the bed with JJ and AC. Even though AC remained oblivious to what occurred between Appellant and JJ in the bed after AC fell asleep, she indeed corroborated JJ's testimony that Appellant was in the bed next to JJ and that they all awoke the next morning in the bed.

Appellant asserts multiple other reasons this court should find his conviction on this specification factually insufficient. Specifically, he argues JJ's post-assault conduct was not consistent with someone who had been assaulted; JJ's statements regarding subsequent relationships she may or may not have had with others in their friend group prove her not credible;[6] and her subsequent diagnosis of BPD renders her unreliable. With respect to BPD, Dr. EB confirmed her testimony was educational in nature as she had not personally evaluated JJ; Dr. EB further confirmed that JJ had no psychiatric history prior to the sexual assault. We find little merit in Appellant's assertions and are unpersuaded such assertions should convince this court his conviction is factually insufficient.

We turn now to how, if at all, *Mendoza* is implicated by the record of trial. Given testimony from JJ that during the assault, she was "pretty much asleep" and that she "was drunk" or "passed out" and that she was "[n]ot able to move[,] very tired, [and] intoxicated," and similar statements, Appellant contends JJ did not have the capacity to consent at any time during the touching or penetration due to either her being incapable of consenting because of impairment by intoxication or because she was sleeping. Appellant further cites the Government's findings argument wherein trial counsel told the panel members that "sleeping people don't consent," and "[w]e know [Appellant] cannot commit a [consensual] sexual act on a sleeping individual [because] [s]leeping

---

[6] The trial transcript and briefs addressing excluded evidence were sealed pursuant to R.C.M. 1113. These portions of the record and briefs remain sealed, and any discussion of sealed material in this opinion is limited to that which is necessary for our analysis. *See* R.C.M. 1113(b)(3)(C)(ii).

individuals cannot consent." The military judge gave the panel members a similar instruction. Because the Government charged the sexual assault pursuant to Article 120(b)(2)(A), UCMJ, rather than Article 120(b)(2)(B) or Article 120(b)(3)(A), UCMJ, 10 U.S.C. §§ 920(b)(2)(b), (b)(3)(A), Appellant contends that "such a charge cannot be proved beyond a reasonable doubt when the evidence proves a sexual act with a person incapable of consenting."

We find the facts as elicited from JJ and the argument of trial counsel implicate *Mendoza*, but we find our superior court's recent decision in *Casillas* more helpful to our analysis. We further find that with respect to *Mendoza*, evidence of JJ's level of intoxication throughout the evening was relevant and admissible to the issues in the case. However, the Government did not rely solely on JJ's level of intoxication or states of sleep throughout the evening to prove she did not consent, but instead, relied on this evidence in conjunction with all the other evidence proving JJ was capable of consenting and did not consent to Appellant digitally penetrating her vulva with his finger on 19 August 2021.

In *Casillas*, the CAAF found that it is possible to determine consent, or lack thereof, during the timeframe after initial penetration on a sleeping person or a person incapable of consenting under the theory of "without consent." *Casillas*, 2025 CAAF LEXIS 692, at *11. Our superior court further held that the victim's testimony "establishe[d] that she was awake and aware of what was happening for at least a short time when [the a]ppellant was penetrating her," *id.* at *14, and that "[d]uring that period, the evidence supports the rational conclusion that [the victim] had the capacity to consent, but that she did not consent to the sexual act." *Id.* We observe that in coming to this conclusion, the CAAF essentially relied on events that occurred earlier in the evening leading up to the initial sexual penetration upon the sleeping victim. We find that similar to *Casillas*, and as this court recently found in *United States v. Slayton*, No. ACM 40583, 2025 CCA LEXIS 427 (A.F. Ct. Crim. App. 8 Sep. 2025) (unpub. op.), we must consider the totality of Appellant's relationship with JJ and the events leading up to sexual penetration when analyzing the issue of consent.

In the case at bar, we are uncertain if Appellant initially digitally penetrated JJ while she was asleep or incapacitated due to her earlier alcohol consumption. What we do know is that Appellant and JJ did not have a romantic relationship any time preceding the assault, JJ considered Appellant to be her "gay best friend," and she thought he was homosexual. She trusted him to be in CS's dorm room with her and AC as they fell asleep because they were part of the same friends group. JJ had not invited Appellant into CS's dorm room, nor did she invite Appellant into the bed at any time throughout the evening into the morning hours. Appellant knew JJ was highly intoxicated before she

fell asleep. More importantly, although Appellant believed JJ was so intoxicated that she would not or could not remember the assault, that is not what the evidence bears out.

JJ testified with detail where Appellant was lying on the bed when she realized what he was doing to her and what she was experiencing. She was able to give details as to where his hand was on her hip and from what side Appellant reached around for access to her vaginal area. JJ testified that she laid there "frozen in fear," while she felt Appellant's hand "crawling" from her stomach into her underwear, where she felt "fingers going inside of [her] vagina." JJ explained that although she had "never been touched like that before" she was aware of what was happening, capable of consenting, and did not consent to the touching by Appellant, and therefore not the penetration of her vulva by Appellant.

At trial and on appeal, Appellant raised the defense of reasonable mistake of fact as to consent. Appellant argues that their friendship, to include how JJ interacted with him throughout the evening; the fact that she changed into a t-shirt over her underwear to go to sleep; and her "lack of any adverse communication of response" during the assault, gave Appellant an honest and reasonable mistake of fact as to her consent. We do not agree. The manner in which JJ socialized with Appellant and her choice of sleep wear the evening of 19 August 2021, gave no license to Appellant to sexually penetrate JJ. Appellant had no prior sexual relationship with JJ and there are no facts to indicate JJ had any desire to have intimate relations with Appellant before he watched her get into bed very drunk and fall asleep. Nonetheless, after following her around all night, assisting her in her drunken state, and going to CS's room with JJ and AC rather than his own room less than a one minute walk from CS's room, Appellant got into bed with JJ and touched her sexually until she awoke frozen with fear while he digitally penetrated her with the intent to gratify his sexual desires. The Government countered Appellant's contention that he held an honest and reasonable mistake of fact and met their burden to prove beyond a reasonable doubt that the defense of mistake of fact does not exist. R.C.M. 916(b)(1); *see McDonald*, 78 M.J. at 379.

Accordingly, viewing all of the evidence in the light most favorable to the Prosecution, and drawing every reasonable inference in the Prosecution's favor, we find the conviction to be legally sufficient because a rational trier of fact could have found the essential elements of the Article 120(b)(2)(A), UCMJ, offense beyond a reasonable doubt as to the theory of "without consent." Moreover, giving appropriate deference to the factfinders at trial, we are not clearly convinced that the finding of guilty was against the weight of the evidence and find the conviction for sexual assault upon JJ factually sufficient.

### b. Abusive Sexual Contact Upon TL

Appellant was convicted of two specifications of abusive sexual contact of TL without consent, in violation of Article 120, UCMJ. As charged, the Government was required to prove the following elements beyond a reasonable doubt: (1) that Appellant committed sexual contact upon TL; and (2) that Appellant did so without TL's consent. *MCM*, pt. IV, ¶ 60.b.(4)(d). In Specification 2 of the Charge, the alleged sexual contact was by Appellant touching TL's groin with his penis, through their clothing, with an intent to gratify his sexual desire. In Specification 3 of the Charge, the alleged sexual contact was by Appellant touching TL's buttocks with his hand, with an intent to gratify his sexual desire.

With respect to Specification 2, TL testified that while they were lying on her bed and while she was trying to comfort Appellant because he was upset, she felt Appellant's penis for approximately "two to three seconds" against her groin while he held her down in the "missionary position." TL had agreed with OSI agents during her interview that what she felt possibly could have been Appellant's cell phone or his wallet, but at trial explained she went along with that proposition from the agents because she was "trying to give [Appellant], [who] at the time [ ] was [her] friend, the benefit of the doubt." She went on to confirm that she was "confident that she felt [Appellant's] penis and not some other object." TL stated she was wearing thin gym shorts and "she could feel the heat coming off of [Appellant's] groin."

With respect to Specification 3, TL testified that during that same interaction with them on her bed while she tried to comfort Appellant, Appellant touched her buttocks for "maybe a second or two" before she pushed his hand away and clarified to him that "they are not those kinds of friends." While Appellant was acquitted of that buttocks touch, he also touched TL's buttocks a second time in a similar manner during their interactions while on her bed as TL tried to comfort an upset Appellant.

Appellant alleges two theories to support his claim of legal and factual insufficiency: (1) that the Government failed to prove he committed sexual contact of any kind on TL; and (2) that even if the Government proved Appellant had committed sexual contact on TL, they failed to disprove that he had a reasonable mistake of fact as to consent. The basis for both of these contentions is Appellant's assertion that TL's testimony is not credible and also not corroborated by independent evidence. We do not agree.

Appellant asserts TL's testimony regarding him touching her groin with his penis is not credible because she could not see his penis since they were both dressed at the time of this sexual contact. Appellant further asserts that because TL entertained OSI's question while they interviewed her as to

whether what she felt might possibly have been something other than Appellant's penis, that out-of-court statement should prevail in rendering her in-court sworn testimony unreliable as inconsistent. We rely on TL's sworn testimony that while Appellant had moved TL into the missionary position and "his arms were sort of holding [her] legs into place," he leaned into her and she "could feel the pressure of his groin area against her groin area." She also testified that she could feel his penis which she believed was erect. This contact did not last long because "immediately a red flag went off" and TL quickly "swooped [her] legs down and [ ] sat up to separate [their] groin areas" stating "[h]ey, we are not those kinds of friends." According to TL, Appellant responded by saying "I know. I know. I'm sorry. I'm sorry." In addition to this, TL testified she was confident it was Appellant's penis and not some other object because she "could feel the heat" and what was pushing on her was not hard like a phone or metal object.

In challenging TL's testimony regarding him touching her buttocks without her consent, Appellant asserts the evidence only proves he "attempted to touch [TL's] buttocks, but was stopped" and thus, the alleged contact never happened. However, Appellant's asserted facts sound more like the first buttocks touch, of which he was acquitted. There was a second buttocks touch, the touch now in issue. TL testified that Appellant "used his right hand and touched [her] buttocks." She further stated that his hand was on her buttocks "maybe a second or two before [she] immediately pushed it away." Similar to after she took action to get Appellant's penis off her groin, once she removed Appellant's hand from her buttocks, she told him, "Hey, we are not those kinds of friends," to which he responded by apologizing. He also confirmed that he knew TL was "going abstinent" and that she was "blacklisted," which as explained supra, meant their friendship was strictly platonic.

Appellant claims that even if we find the Government did prove that the sexual contacts occurred, we should also find that the Government failed to disprove that Appellant had a reasonable mistake of fact as to TL's consent to the sexual contacts. Again, we do not agree. In order for Appellant to have the defense, the mistake must be "reasonable under all the circumstances." R.C.M. 916(k)(j)(1). TL admittedly was a non-confrontational person who at the time never explicitly told Appellant "no" when he touched her sexually without her consent. But that does not form the basis for a *reasonable* and *honest* mistake of fact under the totality of the circumstances in this case. Appellant knew TL was "going abstinent" and that he and she were "blacklisted" meaning they were strictly platonic friends. Moreover, TL had already rebuffed Appellant and impressed upon him that they "are not those kinds of friends" before Appellant committed the sexual contacts for which he stands convicted. His consistent response for his conduct was to apologize profusely. We also find the facts support that Appellant touched TL sexually as he did with the specific

18

intent to gratify his own sexual desires. The facts do not support Appellant's contention that he had an honest or reasonable mistake of fact as to TL's consent for the touching and we find the Government met its burden to disprove as much beyond a reasonable doubt.

Accordingly, viewing all of the evidence in the light most favorable to the Prosecution, and drawing every reasonable inference in the Prosecution's favor, we find the convictions for Specifications 2 and 3 of the Charge alleging abusive sexual contacts of TL to be legally sufficient because a rational trier of fact could have found the essential elements of the Article 120(b)(2)(A), UCMJ, offense beyond a reasonable doubt as to the theory of without consent. Moreover, we are not clearly convinced that the findings of guilty were against the weight of the evidence and find the convictions for these specifications factually sufficient.

### B. Exclusion of Mil. R. Evid. 412 Evidence

#### 1. Law

Mil. R. Evid. 412 is a rule of exclusion which provides that in any proceeding involving an alleged sexual offense, evidence of a victim's sexual behavior or predisposition is not admissible, subject to three limited exceptions. *United States v. St. Jean*, 83 M.J. 109, 113 (C.A.A.F. 2023). The exceptions include:

> (1) evidence of specific instances of a victim's sexual behavior, if offered to prove that someone other than the accused was the source of semen, injury, or other physical evidence;

> (2) evidence of specific instances of a victim's sexual behavior with respect to the person accused of the sexual misconduct, if offered by the accused to prove consent or if offered by the prosecution; and

> (3) evidence the exclusion of which would violate the accused's constitutional rights.

Mil. R. Evid. 412(b)(1)–(3).

We review a military judge's ruling on the admissibility of evidence for "an abuse of discretion." *United States v. McElhaney*, 54 M.J. 120, 129 (C.A.A.F. 2000). Military judges abuse their discretion when: (1) their findings of fact "are not supported by the evidence of record;" (2) they fail "to consider important facts;" (3) they use "incorrect legal principles;" or (4) their application of correct legal principles to the facts is "clearly unreasonable." *United States v. Commisso*, 76 M.J. 315, 321 (C.A.A.F. 2017). "This abuse of discretion standard is a strict one, calling for more than a mere difference of opinion—[t]he challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly

erroneous." *United States v. Hendrix*, 76 M.J. 283, 288 (C.A.A.F. 2017) (alteration in original) (internal quotation marks omitted) (citation omitted).

The military judge may exclude otherwise relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the members, undue delay, wasting time, or needlessly presenting cumulative evidence. Mil. R. Evid. 403. The Mil. R. Evid. 403 balancing test "is a rule of inclusion." *United States v. Banker,* 60 M.J. 216, 223 (C.A.A.F. 2004).

### 2. Analysis

Prior to trial on the merits, Appellant's defense counsel provided notice to the court-martial of their intent to offer evidence pursuant to Mil. R. Evid. 412(b)(3) regarding JJ. Mil. R. Evid. 412(b)(3) provides that such evidence is admissible if its exclusion "would violate an accused's constitutional rights." This encompasses evidence that may be "necessary to protect an accused's Sixth Amendment[7] right to confrontation." *United States v. Erikson*, 76 M.J. 231, 235 (C.A.A.F. 2017) (citing *United States v. Ellerbrock*, 70 M.J. 314, 318 (C.A.A.F. 2011)). The evidence they purported was constitutionally required averred that JJ had made past false allegations of sexual assault against others, not the Appellant, of nonconsensual sexual acts, which "tend[ed] to challenge the veracity of JJ's allegations against [Appellant]." When evidence of an alleged victim's prior accusations of sexual assault is offered under this theory, it is only admissible if the prior accusation is shown to be false. *Erikson*, 76 M.J. at 234; *see also United States v. Velez*, 48 M.J. 220 (C.A.A.F. 1998) (finding that the mere filing of a complaint is not even probative of the truthfulness or untruthfulness of the complaint filed and thus, it is not relevant to the question of credibility of a different complaint in an unrelated case). In denying the defense motion, the military judge found there was no evidence that any past allegations made by JJ were false and such information was not relevant to the issues addressing the charged offenses. Additionally, the military judge found that even if the evidence was marginally relevant, it failed the Mil. R. Evid. 403 balancing test.

Trial defense counsel also provided notice of their intent to offer evidence pursuant to Mil. R. Evid. 412(b)(2) and (b)(3) regarding TL. Mil. R. Evid. 412(b)(2) provides that evidence of specific instances of a victim's sexual behavior with respect to the person accused of the sexual misconduct, if offered by the accused to prove consent or if offered by the prosecution is not generally

---

[7] U.S. CONST. amend. VI.

inadmissible. Appellant claims statements that TL made to Appellant describing her past sexual history and that TL and Appellant had visited a sex store together and while there they play fought with sex toys were admissible facts as exceptions pursuant to the Rules. In denying the defense motion as to the alleged statements, the military judge opined there was "no evidence that TL made [these] comment[s] to [Appellant] at the time of the charged offenses" and found the evidence was not relevant to the issues of consent or reasonable mistake of fact as to consent. When addressing whether the evidence was constitutionally required, the military judge found that it was not because it did "not tend to call into question [TL's] credibility, or the allegations that she did report to OSI." With regard to the alleged conduct of Appellant and TL visiting a sex store and their actions therein, the military judge similarly found that the evidence was not "logically relevant to consent or any other argued theory." Additionally, in denying the defense motion, the military judge found that even if any of this evidence was marginally relevant, it failed the Mil. R. Evid. 403 balancing test.

Appellant argues the military trial judge abused his discretion when he ruled the Mil. R. Evid. 412 evidence described *supra* was inadmissible. We review a military judge's ruling on the admissibility of evidence for "an abuse of discretion." *McElhaney*, 54 M.J. at 129. Military judges abuse their discretion when: (1) their findings of fact "are not supported by the evidence of record;" (2) they fail "to consider important facts;" (3) they use "incorrect legal principles;" or (4) their application of correct legal principles to the facts is "clearly unreasonable." *Commisso*, 76 M.J. at 321. "This abuse of discretion standard is a strict one, calling for more than a mere difference of opinion—[t]he challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous." *Hendrix*, 76 M.J. at 288 (alteration in original) (citation omitted) (internal quotation marks omitted). Because of the sensitive nature of the evidence in issue we will not go into any more detail about the proceedings or the military judge's rulings than stated above. We have reviewed the record thoroughly on the issues and find the military judge did not make erroneous findings of fact and properly applied the correct law, therefore we conclude the military judge did not abuse his discretion in ruling the evidence in issue was inadmissible.

## C. Ineffective Assistance of Counsel

### 1. Law

The Sixth Amendment guarantees an accused the right to effective assistance of counsel. *United States v. Gilley*, 56 M.J. 113, 124 (C.A.A.F. 2001). In assessing the effectiveness of counsel, we apply the standard set out in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and begin with the presumption of competence as stated in *United States v. Cronic*, 466 U.S. 648, 658 (1984).

*See Gilley*, 56 M.J. at 124 (citation omitted). Claims of ineffective trial defense counsel are reviewed de novo. *United States v. Palacios Cueto*, 82 M.J. 323, 327 (C.A.A.F. 2022) (citation omitted).

We utilize the following three-part test to determine whether the presumption of competence has been overcome:

> 1. Are the appellant's allegations true, and if so, "is there a reasonable explanation for counsel's actions"?
>
> 2. If the allegations are true, did defense counsel's level of advocacy "fall measurably below the performance . . . [ordinarily expected] of fallible lawyers"?
>
> 3. If defense counsel were deficient, is there "a reasonable probability that, absent the errors," there would have been a different result?

*United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011) (alteration and omission in original) (quoting *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991)).

The burden is on the appellant to demonstrate both deficient performance and prejudice. *United States v. Datavs*, 71 M.J. 420, 424 (C.A.A.F. 2012) (citation omitted). To overcome the presumption of competence, appellant must show there were "errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

"[C]ourts 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Datavs*, 71 M.J. at 424 (quoting *Strickland*, 466 U.S. at 689) (additional citation omitted). We will not second-guess reasonable strategic or tactical decisions by trial defense counsel. *United States v. Mazza*, 67 M.J. 470, 475 (C.A.A.F. 2009) (citation omitted). When evaluating for prejudice, a "reasonable probability" of a different result is "a probability sufficient to undermine [our] confidence in the outcome" of the trial. *Datavs*, 71 M.J. at 424 (quoting *Strickland*, 466 U.S. at 694) (additional citation omitted).

> [A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.

*United States v. Scott*, 81 M.J. 79, 85 (C.A.A.F. 2021) (alteration in original) (quoting *Strickland*, 466 U.S. at 697) (additional citation omitted).

### 2. Analysis

Appellant alleges his trial defense counsel were ineffective for failing to move for reconsideration of the military judge's ruling excluding Mil. R. Evid. 412 evidence related to TL and for failing to call a witness to testify that JJ had made a past false allegation of sexual assault.

Specifically, after the military judge ruled that evidence alleging TL had at some point in time made comments about her prior sexual history was inadmissible as irrelevant, evidence elicited during trial indicated that TL claimed at the time of the charged offenses she had "gone abstinent." Appellant now argues that his trial defense counsel should have re-raised the issue with the court and because they did not, they were deficient. In their sworn declarations, trial defense counsel explained that they contemplated whether to move the military judge to reconsider his ruling excluding evidence that TL made statements to Appellant about her prior sexual history, but because they understood the initial ruling to be based on the "temporal disconnect between TL's statement and the charged offenses," they believed a motion for reconsideration would be unsuccessful. Moreover, trial defense counsel determined that a motion for reconsideration could draw attention to TL's prior consistent statements about deciding to "go abstinent" and the fact that Appellant not only was aware of this fact but acknowledged TL's abstinence while apologizing for assaulting her.

With respect to Appellant's allegation that trial defense counsel were deficient for failing to call a witness to testify that JJ had made a past false allegation of sexual assault, we do not agree. Trial defense counsel explained they did not call the witness because she was "nervous and anxious" about testifying. Her demeanor was seemingly, to the Defense, a strategic advantage. Trial defense counsel stated they knew "demeanor and delivery" would be critical to the members' findings on the merits and they decided not to call this specific witness because they "did not want to provide her any advantage in appearing more composed or credible at trial." They believed that calling her in motions hearings "would have provided her with an early opportunity to experience testifying." Trial defense counsel had also determined that even if the witness testified the way they wanted her to during the motions hearing, the testimony might still not be deemed admissible at trial. Ultimately, they opted to not provide the witness an opportunity to essentially prepare for her examination on the merits given their assessment that even if she provided evidence helpful to the Defense, it might not be admissible.

We have considered the totality of the circumstances, the presumption of competence, *Cronic*, 466 U.S. at 658, and the declarations of trial defense counsel. We find trial defense counsels' decision not to pursue reconsideration of the Mil. R. Evid. 412 ruling related to TL, and to not call the witness to testify

about alleged false allegations by JJ were "strategic decision[s] to . . . forego a potential benefit" and such decisions were "objectively reasonable." *Datavs*, 71 M.J. at 424. After considering the three *Gooch* factors, 69 M.J. at 362, we do not find the presumption of competence was overcome. Appellant did not meet his burden to demonstrate deficient performance thus, we decline to analyze prejudice.

## D. Post-Trial Appellate Delay

### 1. Law

"[C]onvicted servicemembers have a due process right to timely review and appeal of courts-martial convictions." *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006) (citations omitted). In *Moreno*, the CAAF established a presumption of facially unreasonable delay "where the action of the convening authority is not taken within 120 days of the completion of trial," "where the record of trial is not docketed by the [CCA] within thirty days of the convening authority's action," or "where appellate review is not completed and a decision is not rendered within eighteen months of docketing the case before the [CCA]." 63 M.J. at 142. In *United States v. Livak*, this court adapted the *Moreno* standard for cases referred to trial on or after 1 January 2019 and established an aggregated 150-day standard for facially unreasonable delay from sentencing to docketing with the CCA. 80 M.J. 631, 633 (A.F. Ct. Crim. App. 2020).

Where there is a facially unreasonable delay, we examine the four factors set forth in *Barker*, 407 U.S. at 530: "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice [to the appellant]." *Moreno*, 63 M.J. at 135 (citations omitted). The CAAF identified three types of cognizable prejudice for purposes of the right to timely post-trial review: (1) oppressive incarceration; (2) "particularized" anxiety and concern "that is distinguishable from the normal anxiety experienced by prisoners awaiting an appellate decision;" and (3) impairment of the appellant's grounds for appeal or ability to present a defense at a rehearing. *Id.* at 138–40 (citations omitted). Where there is no qualifying prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006).

Independent of an appellant's due process rights, the Courts of Criminal Appeals have authority to "provide appropriate relief if [an appellant] demonstrates error or excessive delay in the processing of the court-martial after the judgment was entered . . . ." 10 U.S.C. § 866(d)(2); *see United States v. Valentin-Andino*, 85 M.J. 361 (C.A.A.F. 2025).

We review de novo an appellant's entitlement to relief for post-trial delay. *Livak*, 80 M.J. at 633 (citing *Moreno*, 63 M.J. at 135).

**2. Analysis**

Over 18 months have elapsed since Appellant's record of trial was originally docketed with this court. Therefore, under *Moreno* there is a facially unreasonable delay. Accordingly, we have considered the *Barker* factors and find no due process violation or prejudice to Appellant. Appellant has not specifically alleged cognizable prejudice from appellate delay. Since docketing this case, Appellant has hired civilian appellate defense counsel, requested 16 enlargements of time, and both appellate defense counsel and appellate government counsel have viewed and filed sealed documents. In Appellant's sixteenth motion for enlargement of time, appellate defense counsel stated that although 570 days will have elapsed from the date of docketing if the motion was granted, they required the full enlargement period "to ensure there is enough time to complete drafting identified assignments of error and ensure enough time to file substantial portions of the brief under seal." This court granted that motion and Appellant timely filed his brief with portions of the brief under seal. Amongst the sealed issues was a claim of ineffective assistance of counsel. Subsequent to Appellant's filing of his issues brief, appellate government counsel filed motions to compel declarations by Appellant's trial defense counsel and further moved this court to permit the Government to electronically copy and transmit sealed materials to assist trial defense counsel in preparing their declarations. They also requested to file and attach the declarations with this court under seal. These motions were granted on 13 August 2025. On 18 August 2025, appellate government counsel filed a motion to file portions of their answer brief under seal, which we granted. We note the record of trial is more than 1,200 pages and includes multiple sealed documents.

Absent prejudice, we find the post-docketing delay involved in Appellant's case has not been so egregious as to adversely affect the perception of the military justice system. The large majority of the delay was the result of defense requests for enlargements of time in which to file the assignments of error. In addition, we have considered the large size of the record and the number and complexity of the issues Appellant raised. Accordingly, we find no egregious delay and no violation of Appellant's due process rights, *see Toohey*, 63 M.J. at 362; nor do we find any relief warranted in the absence of a due process violation, *see* 10 U.S.C. § 866(d)(2).

## III. CONCLUSION

The findings are correct in law and fact. *See* Articles 66(a), (d), UCMJ, 10 U.S.C. § 866(a), (d) (2024 *MCM*). In addition, the sentence is correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant

occurred. *See* Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and sentence are **AFFIRMED**.



FOR THE COURT

CAROL K. JOYCE
Clerk of the Court